Opinion delivered June 15, 1886.

[No. 1966.]

## M. M. SMITH *v.* THE STATE.

1. PRACTICE—EVIDENCE—CONSPIRACY.—It is a correct general rule that, upon the trial of one of several parties charged as conspirators, evidence of what was said and done by the other conspirators must be limited to their acts and declarations done and made while the conspiracy was pending, and in furtherance of the design; and that what was said and done by them before or afterwards is not admissible against the party on trial.

2. SAME—CASE APPROVED.—The ancient doctrine that a conspiracy must first be established *ipso facto* before proof of acts and declarations of the individual conspirators are admissible against each other, is now exploded. The rule as it now exists is stated in the case of Cox *et als.* v. The State, 8 Texas Court of Appeals, 254, as follows: "Ordinarily, when the acts and declarations of one co-conspirator are offered in evidence against another co-conspirator the conspiracy should itself be first established *prima facie*, and to the satisfaction of the judge of the court trying the cause; but this can not always be required. It can not well be required when the proof depends upon a vast amount of circumstantial evidence—a vast number of isolated and independent facts. And in any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that a conspiracy actually existed, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations." See the opinion for the substance of the testimony of the witness Lentz *held*, under the rule announced, to have been correctly admitted.

3. SAME—EVIDENCE.—It is a rule of evidence that proof of other offenses than the one for which a party is on trial, or evidence of criminal transactions of a similar character, is admissible when it is necessary to establish identity by developing the *res gestæ*, or making out the guilt of the defendant by a chain of circumstances connected with the crime for which he is on trial. See the opinion *in extenso* for evidence *held*, under this rule, to have been correctly admitted.

4. PRINCIPAL OFFENDERS—ACCOMPLICES.—The distinction between princi-

pal offenders and accomplices is properly stated in Cook's case, 14 Texas Court of Appeals, 96, as follows : "The acts constituting an accomplice are auxiliary only, all of which may be and are performed by him ante-. rior and as inducements to the crime about to be committed; whereas the principal offender not only may perform some antecedent act in furtherance of the commission of the crime, but when it is actually committed is doing his part of the work assigned him in connection with the plan, and in furtherance of the common purpose, whether he be present when the main object is accomplished or not. When the offense is committed by the perpetration of different parts which constitute one entire whole, it is not necessary that the offenders should be in fact together at the perpetration of the offense to render them liable as principals. In other words, an accomplice under our statute is one who has completed his offense before the crime is actually committed, and whose liability attaches upon its commission by virtue of his previous acts in bringing it about through the agency of or in connection with third parties. The principal offender acts his part individually, in furtherance of and during the consummation of the crime.

5. Same.—In Bean's case, 17 Texas Court of Appeals, 61, the rule is stated as follows: "If the parties *acted together* in the *commission* of the offense they are principals. If they *agreed* to commit the offense together, but did not *act together* in this commission, the one who *actually* committed it is the principal, while the one who was not present at the commission, and who was not in any way aiding therein, as by keeping watch or by securing the safety or concealment of the principal, would be an accomplice. To constitute a principal the offender must either be present where the crime is committed, or he must do some act during the time when the offense is being committed, which connects him with the acts of commission in some of the ways named in the statute. When the acts committed occur *prior* to the commission of the principal offense, or *subsequent* thereto, and are independent of and disconnected with the *actual commission* of the principal offense, and no act is done by the party during the commission of the principal offense in aid thereof, such party is not a principal offender, but is an accomplice, or an accessory according to the facts." See the opinion *in extenso* for a review of the authorities on the subject, and note the dissenting opinion of Hurt, Judge, holding against the doctrine.

6. Same—Conspiracy—Evidence.—It is not necessary, in order to establish a conspiracy to commit an offense, to prove that the persons charged came together and actually agreed in terms to have that design and pursue it by common means. If it be proved that the persons charged, by their acts pursued the same objects, often by the same means, one performing one part and another another part of the same, so as to complete it with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object, and under our statute such acting together would make all principal offenders, whether present bodily at the place of the offense or not. And they are all principal offenders and acting together as long as any portion or object of the common design remains incom-

plete; in other words, until the full purpose and object of the conspiracy is consummated and accomplished. The charge of the court in this case, harmonizing with the doctrines above announced, was sufficient.

APPEAL from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The appellant, Jim Smith, Dave Smith, Tom Saunders, Frank Saunders and Bud Taylor, were jointly indicted for the theft of five head of cattle, the property of Eugene M. Trammell, and eight head of cattle, the property of W. A. Trammell, in Erath county, Texas, on the fifteenth day of July, 1885. The appellant being alone upon trial, was convicted, and his punishment was assessed at a term of five years in the penitentiary.

Eugene M. Trammell was the first witness for the State. He testified that he and the witness W. A. Trammell were brothers. They formerly lived in Limestone county, Texas, but now live in Stephens county, about eighteen miles beyond Breckenridge, the county seat, to which point they moved in the spring of 1884. They owned cattle in different brands. · Those branded WT (with a bar below) and WT (with a bar below and semi-circle above) on the right side, and XZ on the hip, were owned by W. A. Trammell. Those branded W (with a small w above) on the side and XZ belonged to the witness. Before witness and his brother left Limestone county they put the brand SD on the neck of all their cattle. Leaving Limestone county, the witness and his brother started to take their cattle to Shackelford county. Witness knew the witness Sweet, and knew where he lived in July, 1884. En route to Shackelford county, witness and his brother drove their cattle through the town of Stephenville, and through Erath county, and by and through the neighborhood in which Sweet lived in July, 1884. They took their cattle to a point about three miles beyond Breckenridge, where they located and lived until the spring of 1885, when they moved to their present abode. During the fall of 1884, some of the cattle belonging to witness and his brother drifted off in a snow storm. Among them was a roan cow, two two-year-old steers, eight two and three-year-old heifers, and one yearling. Five of the animals described belonged to the witness, and seven to W. A. Trammell. The remaining animal was owned by the witness and W. A. Trammell jointly. Witness saw no more of the cattle described until July, 1885, when he found four of those which belonged to him, six which belonged to his brother, and the one owned jointly

by him and his brother. All of these cattle the witness recognized by their flesh marks. One of W. A. Trammell's cows then had a sucking calf. The remaining animal which belonged to the witness was afterwards recovered from a herd passing through Stephens county. It had been freshly branded 7UK, as had some of the others recovered. All save the animal last mentioned were found at the place of Mr. Ketchum, in Parker county. The recovery of the cattle was effected under the following circumstances: About the middle of July, 1885, the witness and one Lee went to Mr. Isaac Sweet's place, looking for the cattle. From Sweet's house they went to Morgan's mills, in Erath county. Thence they went to Buckner's crossing on the Brazos river, near which point they met the witness Charles Wesley. Thence they went to Weatherford, in Parker county, and thence to Poolville. Thence they went to Mr. Ketchum's place, where they found the twelve head of cattle described. Lee went to Ketchum's in advance of the witness, and when witness arrived he found the twelve head of cattle in Ketchum's pen. Mr. Ketchum lived in a thick wood on Clear Fork. Monroe Smith had given the witness an order on Ketchum for the cattle, but Ketchum would only release one-half of the cattle on that order. Witness then proved and recovered the remaining six head. Witness and Lee then drove the cattle to witness's home by way of Weatherford, Buckner's crossing and Sweet's place. The cattle recovered in the manner described were the same cattle which disappeared in the snow storm as stated, and were owned by the witness and his brother, W. A. Trammell, in separate parts. No person had the consent of the witness to take the cattle. The cattle found at Ketchum's place were fresh branded, about half with the characters 7UK, and the other half H+M.

J. F. Lee was the next witness for the State. He testified that he knew the Trammell brothers, witnesses in this case, and knew their bunch of cattle which drifted away in a norther. This witness described the cattle as they were described by the witness E. M. Trammell, and detailed as Trammell did the incidents of the search for them. Witness reached Ketchum's place in advance of E. M. Trammell, looked around for, and found eleven head of the cattle. He drove the eleven head to Ketchum's house and penned them with a calf he found in the pen. The calf made the twelfth animal described by E. M. Trammell. Witness and E. M. Trammell drove the cattle described to Trammell's place, in

Stephens county, over the route described by Eugene Trammell. Witness had an order from the defendant on Ketchum for the cattle.

W. A. Trammell testified, for the State, that he was a brother to the witness E. M. Trammell; that he owned seven head of the cattle recovered by his brother E. M., and that they were taken without his knowledge or consent. Witness corroborated in detail the testimony of E. M. Trammell, except as to the incidents of the search and recovery of the animals, of which he had no personal knowledge.

Isaac Sweet was the next witness for the State. He testified that he knew the witnesses E. M. Trammell and J. F. Lee, and saw them at his house about July 15, 1885. Witness lived about thirteen miles northwest of Stephenville, in Erath county, Texas, near the Stephenville and Gordon road. About Christmas, 1884, a bunch of stray cattle came into the witness's neighborhood. The witness described the various brands on the cattle as they were described by the witnesses Trammell and Lee. The bunch numbered twelve head at first, but one of the cows had a calf during the ensuing spring. The cattle described ranged about witness's place until about July 15, 1885. The witness was not acquainted with the defendant or Bud Taylor. He did not know Dave or Jim Smith prior to about July 15, 1885, when they came to his house. Dave Smith called witness from his house, and asked him if Mr. Sweet lived there. Witness replied in the affirmative. Dave Smith then said that he and his companion, Jim Smith, were looking for a bunch of cattle branded SD, and that a man up the road had referred them to Mr. Wylie or witness. Witness asked him who was the man who referred them to him. He replied that he did not know. Witness then told him that the cattle were on the range. Dave Smith then remarked, handing witness a memorandum book: "I have a power of attorney from my brother to get the cattle." Witness saw the brand TW on the page of the book at which he happened to open it, and remarked to Dave Smith: "That brand is wrong; the brand on the cattle is WT." Dave replied that he did not know what brands were on the cattle save the SD, which was the holding brand. Witness returned the book to Dave Smith with the remark that he had no control whatever over the cattle. Witness did not see the power of attorney.

Witness, Dave and Jim Smith were presently joined by a young man named Rochell, whose horse witness borrowed and

went with Dave and Jim to hunt the bunch of cattle. En route, witness asked Dave where his brother got the cattle, and he replied that the bunch belonged to his brother's ranch out west. Nine head of the cattle were soon found and driven to the witness's house and penned, and the parties started off again to look for the remaining animals. The party separated, Dave taking one route alone, and witness and Jim Smith another together. Witness asked Jim where his brother's western ranch was located. He replied that his brother had no ranch, and that the cattle hunted for belonged to a home bunch. After traveling some little distance witness heard some person hallooing. He and Jim Smith rode to the point whence the calls came, and found Dave Smith with the missing cattle. He had been joined by Tom and Frank Saunders, two men who lived in witness's neighborhood, about three miles distant from the witness. The four head of cattle were then driven to witness's pen and put into the pen with the other nine head. A dispute now arose over the yearling, which did not have the SD brand on the neck. Witness remarked: "You had better not take that yearling, or you might get in for it." Tom Saunders replied that he would swear that he had seen the yearling suck one of the SD cows. Witness's wife remarked that the yearling came into the neighborhood with that bunch of cattle. The Smiths (Dave and Jim) then said they would take the yearling, and asked the way to Morgan's mill. Witness directed them, and they left, going in that direction, and taking the thirteen head of cattle described. Tom and Frank Saunders went with them. The Smiths told the witness that their postoffice was Poolville, Parker county, though Dave said that he lived in Wise county, Texas. Witness proposed to trade with them for the cow and calf, but they declined upon the plea that the animals belonged to their brother and not to them. Witness told them that other cattle in the SD brand were running at large in the country. They requested witness to write them at Poolville, should he chance to see any more in that brand. Witness described to them a horse which he had lost, and asked them to write to him should they chance to hear of the animal, which they agreed to do. They did not mention the initials of their names to the witness.

On the eighth day after Dave and Jim Smith and Tom and Frank Saunders left witness's house with the cattle, Eugene M. Trammell and J. F. Lee came to witness's house hunting the bunch of cattle. Witness went with them as far as Morgan's

mill, where they parted company, witness returning home. About a week afterwards. Eugene Trammell and Lee returned to witness's house with a bunch of cattle, which they put in the witness's pen. Witness readily identified that bunch as the same bunch of cattle which Dave and Jim Smith took away on the occasion referred to. When at witness's house. Dave and Jim Smith were riding sorrel horses, and had with them a short tailed gray pack horse, in poor condition. Witness noticed that the cattle, when brought back by Eugene Trammell and J. F. Lee, had fresh brands on them, but he did not examine close enough to be able to tell what the brand was. Tom Saunders was a heavy set man, weighing, perhaps, one hundred and seventy pounds. He was about twenty-five years old, had a red complexion, light hair and light mustache, but wore no whiskers. He had left the country, and witness knew nothing of his present whereabouts.

Charles Wesley testified, for the State, that he lived in Parker county, Texas, thirteen miles south of Weatherford, and about two hundred and fifty yards distant from the Brazos river at the Buckner crossing, which is on the Stephenville and Weatherford road. Morgan's mill is situated on that road. About noon on or about July 15, 1885, witness saw three men driving a bunch of twenty-five or thirty head of cattle towards Weatherford. The cattle appeared to have been driven very hard, and their tongues were hanging out. Witness knew none of the men at the time, but has since recognized Jim Smith as one of them; Dave Smith resembles another one of them, but witness could not positively identify him. The third was a heavy set man, with light hair and mustache, but no beard. He had a red face, and would weigh one hundred and sixty or one hundred and seventy pounds. One of the three men rode a short tailed gray horse. They had a sorrel pack horse with them. Five or six days afterwards witness saw Eugene Trammell and J. F. Lee going south, past his house, driving a bunch of ten or twelve cattle, which the witness recognized as some of the animals driven by the three parties as before stated.

John Guyger testified, for the State, that he knew Tom Saunders. Witness was at the house of his brother-in-law, Jim Baker, on the sixteenth day of July, 1885. Baker lived about a half a mile south of Charles Wesley's house. About noon, or a little past, on the said July 16, witness saw Tom Saunders and Willis Brooks, driving a bunch of cattle—ten or fifteen in num-

ber—past Baker's house, in the direction of Weatherford. Witness knew Tom Saunders and Willis Brooks well. They both lived in the same neighborhood in which witness and Isaac Sweet lived. Witness described Tom Saunders as the witness Sweet did.

Jim McConnell testified, for the State, that, early on the morning of about July 15, 1885, he met Dave and Jim Smith on the north suberb of the town of Weatherford, driving a bunch of ten or twelve cattle. They were traveling north. The road forked at a point a short distance beyond where the witness met them. One fork of that road led to Poolville, and the other to Cartersville. Witness did not remember which of the roads the Smiths took with their cattle. They had with them a short tailed gray pack horse, in very poor condition.

Henry Lentz testified, for the State, that he knew the defendants, Dave Smith and Bud Taylor, the latter of whom had lived at witness's house for a considerable time. Witness heard of the arrest of the Smith boys for cattle stealing. Some time before that arrest, or on Sunday, July 12, 1885, the defendant came to witness's house, and requested witness to write a power of attorney for him, authorizing Dave Smith to gather some cattle for him in the SD brand. Those cattle, he said, were in Erath county. Witness wrote the power of attorney for him, and he took it off with him. That instrument was written on a half sheet of foolscap paper, and was folded and endorsed. Dave Smith lived in Wise county. Defendant and Jim Smith lived in Parker county. Poolville is the postoffice of each of them. Taylor owned forty or fifty head of cattle branded WT—.

James Lentz testified, for the State, that he knew Bud Taylor. Taylor had lived with witness's father for some time. Witness had been living in the Indian Territory for some time, but came back to Parker county during the spring of 1885. On the third day of July, 1885, while witness and Bud Taylor were chopping cotton in witness's father's field, Taylor asked witness: "Jim, did you ever pull anything?" Witness replied: "Nothing bigger than a watermelon." Taylor then said: "I know where there is a bunch of stray cattle, and if you will go and get them, I will get another man to go with you. You can bring them up to Cartersville prairie, where I will meet you with some of my cattle, and we will throw them together, and take them to Fort Worth and sell them, and divide the profits." Witness replied that he would engage in no such enterprise, and the subject was

dropped. Bud Taylor continued to live at the house of witness's father until he attended court as a witness, when he was arrested as a party to this offense. The witness never told his father or any other person about Taylor's proposition until a few days before this trial, when the several parties came to attend this term of the court. He then told McConnell about it. Bud Taylor owned forty or fifty head of cattle branded WT--.

Witness knew the defendant, and saw him on Sunday, July 12, 1885. Witness first met him in the road on that day, while he was on his way to church. He told witness that he wanted to speak to him. Witness went on to church. At the conclusion of the ten o'clock service, defendant appeared at the church door and motioned to witness to join him outside, which the witness did. The witness and defendant walked off some distance from the church, and defendant told witness that he wanted witness to go with his brother Dave to a point below Gordon to get a bunch of cattle which he had bought. Witness told defendant in reply that other engagements would prevent his going. He then asked if witness could recommend some suitable person. Witness asked why he did not get Bud Taylor to go. Defendant laughed, and remarked that Bud was in no condition to ride—referring to the venereal disease from which Taylor was then suffering. The witness and defendant then returned to the church house, and defendant rode off.

P. J. Morris testified, for the State, that he knew the defendant, Dave and Jim Smith, and Bud Taylor. Witness and his brother-in-law began work on a well for the defendant about July 1, 1885. Defendant, at the same time, was at work on some gin timbers near by. Defendant was putting up a gin, and witness and Kenyon were digging the well from which it was proposed to supply the gin engine with water. Bud Taylor came to defendant's place one day, and held a long conversation with the defendant, the purport of which the witness did not know, as the conversation was held in retirement, but in sight. Taylor came a second time and had a second private talk with the defendant. These two conversations were held between the fourth and seventh days of July. On Sunday, July 12, Dave and Jim Smith started off after cattle. Witness and Kenyon spent the night at defendant's house a few nights before Dave and Jim started off after the cattle. Early on the next morning, witness and Kenyon joined defendant and his wife at the cow pen in which defendant had up a cow and calf of his own,

and two stray cows.   The stray cows coming up for discussion, the defendant said that he knew who owned them, and that he could buy them both for thirty dollars.   Witness advised him to make the purchase.   He then remarked that he had thirty or thirty-two head out west.   Witness asked if he had them in charge of any one, and if he was not afraid they would stray off or be stolen.   He replied that he was to pay for those only which he could secure.   A few days after this, and a day or two after Dave and Jim Smith started after the cattle, the defendant borrowed the witness's horse for one of the parties to ride after the cattle.   The horse was to be returned on the following Wednesday night.   When he borrowed the horse, the defendant said that he had a bunch of from thirteen to sixteen head of cattle in Erath county—out west.   Witness said: "Erath county is south; Stephens and Palo Pinto counties are west."   Defendant replied:   "Stephens county!   By G—d, that is the county!"

Jim Smith returned to defendant's house on the Friday morning following the Sunday of his departure.   He got back very early—before sunrise.   Defendant left home on the same morning.   He had not been gone from home during the absence of Dave and Jim.   Witness knew nothing of a western ranch owned by the defendant.   He did know that the defendant owned no home bunch of cattle, or other home cattle than the cow and calf mentioned.   During the week prior to the departure of Dave and Jim Smith, witness had a conversation with Jim Smith at the well on the defendant's premises, in the course of which Jim told him that defendant and Dave Smith were going to Erath county to get a bunch of cattle for Bud Taylor.   Defendant intended to go on the trip to Erath county after the cattle, until the morning of the day on which Dave and Jim started.   Witness had a conversation with Jim Smith after his return from Erath county.   Witness asked him how his horse stood the trip.   Jim pointed west toward Whit and replied: " He got along very well until we got beyond Whit, when he bucked like h—ll."   Witness then asked him if they got the cattle, and he replied that they did; that, on the day before they had them near Whit, and that it being a day's drive home or to Cartersville prairie, they drove them to the prairie, and that Monroe (defendant) had gone to the prairie to get them and take them to Fort Worth.   Witness then asked him if he got the cattle for Bud Taylor, and he replied in the affirmative.   Witness then remarked: " Monroe says they are his," to which Jim replied:  " I

believe they are partners." When defendant rode off, on the morning that Jim returned, he said that he was going to take the cattle to Fort Worth to sell them. He returned on Sunday evening, and when the witness asked if he had sold the cattle, he replied: "No, cattle are off like h—ll"—meaning, as witness understood him, that cattle were down in price. He then added that he had put the cattle in a pasture near Fort Worth. L. S. Kenyon testified substantially as did Morris.

William Brownlee testified, for the State, that he knew Dave Smith, and lived within four hundred yards of him in Wise county. He knew of Dave's trip after cattle in July, 1885. During the previous week Dave told the witness that he and his brother Monroe were going to Erath or Stephens county (witness could not recall which) after a bunch of cattle for Bud Taylor.

Elisha Wilson testified, for the State, that he knew defendant, and lived near him in July, 1885. If defendant owned a ranch out west, witness did not know it. He owned no home cattle save a cow and calf. He owned a wagon and team, and nothing else that witness knew of.

The State closing, the defendant introduced his father, A. L. Smith, as his first witness. He testified that he knew of the trip of Dave and Jim Smith to Erath county to get some cattle for the defendant. Defendant intended going with Dave until the morning they were to start, when something occurred to render his going impossible, and he got Jim to go in his stead. Jim came to witness's house to get a saddle to ride on the trip. Jim was then suffering with diarrhœa, and witness urged him not to go, but without effect. Witness did not know how far he was going, nor how long he was going to be gone, nor did he inquire.

William Jennings testified, for the defense, that he was a brother-in-law to the Smith boys. He knew of Dave and Jim Smith going to Erath county to get some cattle for Monroe Smith, the defendant. Defendant tried to get witness to go with them, but he could not get off. Defendant then said he would get a man at Poolville to go. Afterwards he got Jim Smith to go with Dave.

The motion for new trial raised the question discussed in the opinion.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. Six parties were jointly charged with the theft of the cattle mentioned in the indictment, to-wit, M. M. Smith (this appellant), Jim Smith, Dave Smith, Tom Saunders, Frank Saunders, and Bud Taylor. A severance was had and each of the parties was tried separately. Bud Taylor was tried before this appellant, but his conviction was set aside and a new trial awarded him after the conviction of this appellant.

We will make a brief and succinct statement of such of the material facts shown in evidence as are necessary to explain and illustrate the questions presented on this appeal. Thirteen head of cattle belonging to Eugene and W. A. Trammell, branded some WT (with a bar below), some WT (with a bar below and semi-circle above), and others XZ on the hip, and all branded SD on the neck, were running as estrays in the neighborhood of one Isaac Sweet, in Erath county, and had been for some months prior to the fifteenth day of July, 1885. On or about the fifteenth day of July, Jim Smith and Dave Smith came to Sweet's and said they were looking for a bunch of cattle branded SD, and Dave said he had a power of attorney from his brother to get the cattle. Dave Smith, Jim Smith, Tom and Frank Saunders hunted for and got up the cattle and drove them off on the fifteenth of July, M. M. Smith and Bud Taylor neither being present, but both being at their homes in Parker county, some forty miles distant.

Prior to the date of the taking, however, it is made to appear by the evidence that on the third of July, Bud Taylor proposed to the witness James Lentz that witness should go with another party and get a bunch of stray cattle, and bring them up to Cartersville prairie, where he, Taylor, would meet him with some of his, Taylor's own cattle, and they would throw the cattle together, take them to Fort Worth and there sell them and divide the profits. Taylor owned some forty or fifty head of cattle branded WT. The witness Lentz declined to go. A day or so afterwards, some time between the fourth and seventh of July, Bud Taylor was seen on two different occasions at appellant M. M. Smith's house, holding private conferences with him. During the week succeeding these conferences appellant M. M. Smith borrowed from the witness Morris a horse, saying he wished to go after a bunch of cattle which he had bought out west. From some cause not explained he did not go, but he let his brother Jim Smith have the borrowed horse to ride after the

cattle. On Sunday, the twelfth, this defendant, having doubtless determined not to go in person, got the witness Henry Lentz to write for him a power of attorney authorizing Dave Smith to gather cattle branded SD; and on the same day defendant proposed to James Lentz, the same party to whom Bud Taylor had made his proposition, that he, Lentz, should go with his, defendant's brother Dave Smith down below Gordon after a bunch of cattle he, defendant, claimed to have bought, and at the same time explained to witness why Bud Taylor could not go. Lentz did not go, but Jim Smith went with his brother Dave, and they started on the twelfth. As above stated, these parties, Dave and Jim Smith, and Tom and Frank Saunders, were together and took the cattle and drove them from Isaac Sweet's place in Erath county on the fifteenth of July. On the sixteenth of July, Tom Saunders and a man by the name of Brooks were seen in Parker county, on the Stephenville and Weatherford road, with a bunch of some ten or fifteen head of cattle, taking them in direction of Weatherford. Thirteen miles south of Weatherford, in Parker county, the witness Wesley, on the sixteenth of July, and about twelve or one o'clock in the day, saw Jim Smith and Dave Smith, and a third party whose description suits exactly the description of Tom Saunders, driving a bunch of cattle containing between twenty-five and thirty head, going in the direction of Weatherford.

After the return of Jim and Dave from the expedition, in a conversation with the witness Morris, whose horse had been ridden by Jim, Jim Smith told witness that they had driven the cattle through to Cartersville prairie, "where Monroe (M. M., the appellant,) had gone to get them to take them to Fort Worth." Morris asked him "if he had got the cattle for Bud Taylor?" and he said "yes." "I said Monroe (M. M.) says they are his cattle; to which Jim replied, 'I believe they are partners.'" After Jim's return Monroe left. Morris, the witness, says: "When Monroe rode off he said he was going to take the cattle to Fort Worth to sell them. He returned Sunday evening and I asked him if he had sold the cattle. He said, 'No; cattle are off like hell,' (by which I understood him to mean that the price of cattle was low.) He then added that he had left the cattle in a pasture near Fort Worth." About the last of July, Eugene Trammell, one of the owners, recovered these cattle at the place of a man named Ketchum, in Parker county. M. M.

Smith, this appellant, gave him an order on Ketchum for the cattle.

Such are the material facts established by the evidence. A number of bills of exceptions to the admission, over objection, of testimony claimed to be irrelevant, illegal and inadmissible, appear in the record.

It is insisted that if any conspiracy is established between appellant and Bud Taylor, then that such conspiracy is not shown to have existed on the third of July, and that any acts, declarations or conduct of Taylor, in the absence of defendant, prior to the conspiracy, and not in furtherance thereof, cannot be used as evidence against this defendant. And we are cited to the general rule as announced in Cox, Ryan et als. v. The State, 8 Texas Court of Appeals, 254, to the effect that the evidence of what was said and done by the other conspirators must be limited to their acts and declarations done while the conspiracy was pending and in furtherance of the design, "what was said by them *before or afterwards* not being within the principles of admissibility." This rule is unquestionably correct. The old rule, however, that a conspiracy must first be established *ipso facto* before proof of acts and declarations of the individual conspirators are admissible against each other is now exploded. "Ordinarily, when the acts and declarations of one co-conspirator are offered in evidence against another co-conspirator the conspiracy should itself be first established *prima facie*, and to the satisfaction of the judge of the court trying the cause; but this can not always be required. It can not well be required where the proof depends upon a vast amount of circumstantial evidence—a vast number of isolated and independent facts. And in any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations." (Cox v. The State, *supra*.) A conspiracy to commit crime is rarely ever susceptible of proof by direct or positive proof.

1. It is objected that the evidence permitted of what transpired between the co-conspirator Bud Taylor and the witness James Lentz on the third of July, with reference to Taylor's proposition that the witness would go and get the stray cattle and bring them to Cartersville prairie, where Taylor would throw some of his own cattle with them, and drive them off and

sell, and divide profits, were statements of independent acts and declarations of Taylor before a conspiracy is shown to have existed between defendant and Taylor. We are of opinion that the circumstances, whilst not conclusive, perhaps, are sufficiently cogent to warrant the inference that a conspiracy between the parties did exist at that time. Taylor tried to induce the witness to go after a bunch of stray cattle, which were to be driven to Cartersville prairie, and there mixed with other cattle. Defendant sent his brothers to get a bunch of stray cattle, he and Taylor having had a conference after Lentz refused to go. The brothers go and get the stray cattle, thirteen head, mix them with ten or twelve head the next day, drive the twenty-five or thirty head to Cartersville prairie. One of the brothers says that he has brought back the Taylor cattle, and that his brother M. M. (appellant) and Taylor are partners in the cattle. We think these facts warrant the inference that the conspiracy already existed when the conversation occurred between the witness Lentz and Taylor on the third of July. At all events we are not prepared to say, in view of the other evidence, that the court erred in admitting this testimony.

2. It is insisted that the court erred in admitting in evidence, over objection of defendant, the testimony of Guyger to the effect that on the sixteenth of July, the day after the alleged stolen cattle were taken, he, the witness, saw Tom Saunders and Willis Brooks driving ten or twelve head of cattle along the road towards Weatherford. The objection is that there is no evidence that these cattle were stolen, or, if stolen, that they were stolen at the same time the cattle in question were stolen; or that this appellant was in any manner connected with these particular cattle. Tom Saunders was one of the parties who, in connection with Jim and Dave Smith, took and drove the stolen animals from Sweet's. There were thirteen cattle taken. The witness Wesley says that he saw Jim and Dave Smith, and a man whose description suits that of Tom Saunders exactly, about two hundred and fifty yards south of the Brazos river, at Buckner's crossing on the Stephenville and Weatherford road, driving a bunch of cattle of twenty-five or thirty head. Guyger had seen Brooks and Tom Saunders before they got to Buckner's crossing. At Buckner's crossing Tom Saunders is seen with Dave and Jim Smith, and their herd of thirteen head has increased to twenty-five or thirty head. If for no other purpose, we are of the opinion the evidence was entirely legitimate to show the manner of, and

to account for, the increase in the herd of the stolen cattle.  But, besides this, the defendant had told Morris that he had bought thirty or thirty-two head of cattle out west, and that he was only to pay for what he got; and this was only a day or two before Jim and Dave Smith started after the cattle.  The rule is that evidence of other offenses than the one for which a party is on trial, or evidence of criminal transactions of a similar character, is admissible "when it is necessary to establish identity by developing the *res gestœ*, or making out the guilt of the defendant by a chain of circumstances connected with the crime for which he is on trial."  (Galbraith v. The State, 41 Texas, 567.)  We are clearly of the opinion that this evidence tended to establish the identity and *res gestœ* of the transaction, and was a legitimate link in the chain of circumstances connected with the crime for which defendant was on trial.

3. But it is most urgently and seriously contended that the court erred in charging the law as to principal offenders with regard to this defendant's liability, because it is said that there was no testimony upon which it could possibly be based, the evidence having clearly established that defendant was not present and actually participating in the theft at the time the animals were taken by Jim and Dave Smith.

"All persons are principals who are guilty of acting together in the commission of an offense." (Penal Code, Art. 74.)  But again, "if any one, by employing a child, *or other person who can not be punished,* to commit an offense  *  *  *  *  *or by any other indirect means,* cause another to receive an injury to his person or property, the offender, by the use of such indirect means, becomes a principal." (Penal Code, Art. 77.)

Mr. Bishop says: "One plain proposition is that there can be no crime without a principal.  There may be more principals than one, but there must be at least one.  Therefore a man whose sole will procures a criminal transaction is principal, whatever physical agencies he employs, whether he is present or about when the thing is done." (1 Bish. Crim. Law, 7 ed., sec. 640.)  Again he says: "And because there must always be a principal, one is such who does the criminal thing through an innocent agent, though personally absent. (Id., sec. 651.)

But the question is, can a party under any circumstances be a principal offender under our statutes when he is not present at the time and place, and participating in the commission of the crime, where the party actually committing it is not an innocent

but a guilty agent, by virtue of his own guilty knowledge and intent? Mr. Bishop, as a rule, says not, but holds that the relation of the instigator becomes changed from that of a principal to that of an accessory before the fact (or an accomplice), on account of the changed relationship of his agents. He says: "But, if the agent employed incurs guilt, then the employer is simply an accessory before the fact." (Id.) Only two authorities are cited in support of the text, and they have not been accessible.

If correct in principle, the doctrine cannot be of universal application under our code, where all persons are principals who are guilty *of acting together* in the commission of an offense. Parties may *act together,* whether they are bodily present together or not.

We believe that the distinction drawn by us between principal offenders and accomplices as known to our code has been as clearly and accurately stated, as we are able to present it, in the cases of Cook v. The State, 14 Texas Court of Appeals, 96, and Bean v. The State, 17 Texas Court of Appeals, 61. In the former case it is said: "We are of opinion that the proper distinction between these two characters of offenders is this: The acts constituting an accomplice are auxiliary only, all of which may be and are performed by him anterior and as inducements to the crime about to be committed; whilst the principal offender not only may perform some antecedent act in furtherance of the commission of the crime but, when it is actually committed, *is doing his part of the work* assigned him in connection with the plan and furtherance of the common purpose, whether he be present where the main fact is to be accomplished or not. Where the offense is committed by the perpetration of different parts which constitute one entire whole, it is not necessary that the offenders should be in fact together at the perpetration of the offense, to render them liable as principals. In other words, an accomplice under our statute is one who has *completed his offense before the crime is actually committed,* and whose liability attaches after its commission by virtue of his previous acts in bringing it about through the agency or in connection with third parties. The principal offender acts his part individually in furtherance of and during the consummation of the crime."

In Bean v. The State, it is said: "The dividing line between the two is the commencement of the commission of the principal offense. If the parties *acted together* in the commission of the

offense, they are principals. If they, agreed to commit the offense together, but did not *act together* in its commission. the one who actually committed it is the principal, while the other, who is not present at the commission, and who was not in any way aiding in its commission, as by keeping watch or by securing the safety or concealment of the principal, would be an accomplice. To constitute *a principal,* the offender must either be present where the crime is committed or he must do some act during the time when the offense is being committed which connects him with the act of commission in some of the ways named in the statute. Where the acts committed occur *prior* to the commission of the principal offense, or *subsequent* thereto, and are independent of, and disconnected with, the *actual commission* of the principal offense, and no act is done by the party during the commission of the principal offense, such a party is not a principal offender, but is an accomplice or an accessory according to the facts."

In Welsh's case, 3 Texas Court of Appeals, 413, where the employer ordered his servants to take all the cattle they could find, and that in the meantime he would go ahead and make arrangements to ship or sell them, he was held to be a principal offender, because he was engaged at the time of the theft in performing his part in the consummation of the conspiracy to steal and dispose of them.

In Scales's case, 7 Texas Court of Appeals, 361, part of the conspirators were to steal the horses in question, whilst the rest were to get up provisions and an outfit to enable them all jointly to take the horses to Fort Elliott and sell them. (See statement in McKeen v. The State, 7 Texas Ct. App., 631.) They were all held principal offenders because doing their separate parts and acting together in consummating the conspiracy.

In McCampbell v. The State, 9 Texas Court of Appeals, 124, it is said: "If the facts should show an actual participancy by appellant in the original fraudulent taking, a conviction may be sustained for the offense charged, although the appellant may not have been personally present at such taking."

In Cohea v. The State, 9 Texas Court of Appeals, 173, it is said: "He need not be actually present at the taking, if the act was committed in pursuance of a common intent and a previously formed design where the mind united and concurred with that of the actual taker."

As before stated, evidence in proof of a conspiracy to commit

crime will generally, from the nature of the case, be circumstantial. It is not necessary to prove that the defendants came together and actually agreed in terms to have that design and pursue it by common means. If it be proved that defendants by their acts pursued the same objects, often by the same means, one performing one part and another another part of the same, so as to complete it with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object (Slough's case, 5 Fed. Rep., 680), and under our statute such acting together would make all principal offenders, whether present bodily at the place of the offense or not (Berry v. The State, 4 Texas Ct. App., 492; Heard v. The State, 9 Texas Ct. App., 1; Wright v. The State, 18 Texas Ct. App., 358), and they are all principals and acting together as long as any portion or object of the common design remains incomplete; in other words, until the full purpose and object of the conspiracy is consummated and accomplished. Hence, "where in larceny it was shown that the conspiracy extended as well to the dividing of the stolen goods as to the theft; what one did between the stealing and the dividing was deemed good evidence against both." (2 Bish. Crim. Proc., 230, citing Scott v. The State, 30 Ala., 503.) This doctrine is expressly recognized and adopted by us in O'Neal v. The State, 14 Texas Court of Appeals, 582, and the same rule is announced in Allen v. The State, 12 Lea, Tennessee, 424.

Now, in applying the law as above stated to the case in hand, if Jim and Dave Smith were the innocent agents of M. M. Smith, then M. M. Smith was a principal. If there was a conspiracy between all the parties to commit the theft, the part to be done by Jim and Dave being to take the property, and the part assigned to M. M. being the sale after it was so taken, then all were principal offenders.

The charge of the court was an able and complete elucidation of these principals of law as applicable to the facts; and it was moreover expressed in such manner as that the rights of the defendant were specially guarded against any evidence which might in certain contingencies be inapplicable to his connection with the crime. No additional instructions were asked.

We have given this record our most careful attention and consideration, and, under the law and facts, we have found no

error either in the conviction or the rulings complained of as error. The judgment is affirmed.

*Affirmed.*

Opinion delivered March 23, 1886.

## Dissenting Opinion by Hurt, J.

Hurt, Judge. This is a conviction for theft of cattle, the property of Eugene and W. A. Trammell. The point raised on the indictment was disposed of in the Jim Smith case, a companion case to this decided at the present term. The view I take of this case renders necessary a discussion of the other questions raised.

The theory of the State is that appellant, with others, conspired to steal the cattle in question, and that in pursuance of this conspiracy the cattle were taken by others, and at the time of the taking the appellant was doing some act in aid of those actually engaged in the taking, and was therefore a principal in the theft. I desire to discuss, first, what acts constitute the actor a principal under our code; second, was appellant, not being present at the taking, engaged in any act which would make him a principal?

First question: Who are principals under our code?

Now, I desire to state and prove the following proposition: That, where the accused is not present at the commission of the offense the statute specifically points out what he must be doing to constitute him a principal. Then to the statute. Article 74, Penal Code, declares that all persons are principals who are guilty of acting together in the commission of an offense. What are we to understand by "acting together," as used in this article? Does it mean that if the parties act together in the most comprehensive sense of the expression, that they are acting together within the meaning of this article? I think not, for, if so, why provide in Article 75 that "when an offense is actually committed by one or more persons, but others are *present,* and, knowing the unlawful intent, aid by acts, or encourage by words or gestures, those actually engaged in the commission of the unlawful act, they are principals? Would not such be "acting together," and hence principals under Article 74?

These observations apply also to those who keep watch so as to prevent the interruption of those actually engaged in the commission of the unlawful act; in fact, to each and every state

of facts constituting the actor a principal by the provisions of Article 76. In one sense they are acting together in the commission of the offense, but not in the sense of Article 74.

I believe that much light can be obtained from the common law upon this subject, and when we consult it we will find that our code has departed but little from the common law. At common law there are principals in the first and second degrees. A person who is a principal within the meaning of Article 74 would at common law be a principal in the first degree; hence I believe that a principal under Article 74 "is he that is the actor or absolute perpetrator of the crime." Mr. Blackstone says: "A man may be a principal in an offense in two degrees. A principal in the first degree is he that is the actor, or absolute perpetrator of the crime; and in the second degree, he who is present, aiding and abetting the fact to be done." To be a principal in the second degree it is not necessary for the party to be actually present; for, says this learned writer, "which presence need not always be an actual, immediate standing by, within sight or hearing of the fact, but there may be also a constructive presence, as when one commits a robbery or murder, and another keeps watch or guard at some convenient distance." What great similarity in the common law and our code so far! So striking is this similarity, that I have no doubt but that the provisions of the code upon this subject were taken from the common law.

This similitude does not stop with Articles 74 and 75, but extends to Article 77; for, says the author, "and this hath also other exceptions; for in case of murder by poisoning, a man may be a principal felon by preparing and laying the poison, or persuading another to drink it, who is ignorant of its poisonous quality, or giving it to him for that purpose; and yet not administer it himself, nor be present when the very deed of poisoning is committed. And the same reasoning will hold with regard to other murders committed in the absence of the murderer, by means which he had prepared beforehand, and which probably could not fail of their mischievous effect; as by laying a trap or pitfall for another, whereby he is killed; letting out a wild beast with intent to do mischief, or inciting a madman to commit murder, so that death therefrom ensues. In every one of these cases the party is guilty of murder as a principal in the first degree. For he can not be called an accessory that necessarily presupposes a principal; and the poisoning, the pitfall, the beast,

or the madman, can not be held the principal, being only the instruments of death.  As, therefore, he must be certainly guilty either as principal or accessory, and can not be so as accessory, it follows that he must be guilty as principal, and if principal, then of the first degree; for there is no other criminal, much less a superior in the guilt, whom he could aid, abet, or assist." (Bl. Com., vol. 2, b'k 4, p. 32.)

We have just such principals as are described by Mr. Blackstone.  In fact our code is not so specific as the law writer. Suppose the means mentioned in Article 77 are not resorted to, and the party is acting alone, without aid from· others in any manner, our code assumes him to be a principal.

We have found that "acting together" in Article 74 means that the persons must be the actors, the *absolute perpetrators of the crime*, or principals in the first degree at common law; and we have found that the persons described in Article 75 were principals in the second degree at common law, and are made principals by our code, there being no degrees in principals in this State.  Those, to be such, must if present know the unlawful intent, aid by acts, or encourage by words or gestures.  Aid or encourage whom?  Those actually engaged in the unlawful act, the *absolute perpetrators of the crime*.  Or those who, *not being actually present*, keep watch so as to prevent the interruption of those *engaged*, the *absolute perpetrators of the crime*, in the commission of the crime.  If not the absolute perpetrators of the crime, we are informed just what the person or persons must do, or be doing, to constitute him or them principals.

We now proceed to notice some principals, made so by our code, who are not actually or constructively present.  They are found in Article 76.  Now these persons are principals, not at common law, but made so by our code.  Who are they, or what acts must they do, or be doing, when the offense is being committed, to constitute them such?  They must be engaged in procuring *aid, arms. or means* of any kind.  For what purpose? *To assist in the commission of the offense.*  At what time or when must these persons be engaged in procuring *aid, arms, or means* of any kind?  While others—the actual perpetrators—are executing the unlawful act.  Or, to be a principal under Article 76, the persons must endeavor to do what?  To secure the safety or concealment of the offenders.  When?  *At the time of the commission of the offense.*  The persons keeping watch and the persons doing, or endeavoring to do, the acts and things men-

tioned in Article 76, are the only persons who are principals *when not present at the commission of the unlawful act.*

It is of course understood that the party, or parties mentioned in Article 77 are principals, though not present, for they must of necessity be principals. An accomplice presupposes a principal offender, and can not exist without such.

I find, therefore, that our code specially enumerates the acts to be done, and the exact time, with reference to the main act at which they are to be done or endeavored, which constitute the actors principals; and it is evident that those performing the specified acts, and the actual perpetrators of the crime, in one sense are guilty of *acting* together in the commission of the crime. This being the case, if those who are present with knowledge of the unlawful intent, aid, etc., or, not being present, keep watch, or, not being present, are guilty of the acts specified in Article 76, are included in Article 74 because *acting together,* then I ask why enumerate at all?

I therefore conclude that the following persons are principals:

First. They who are guilty of acting together—*the actual* absolute *perpetrators of the crime*—in the commission of an offense. (Art. 74.)

Second. Those who are present, with knowledge of the unlawful intent, aid by acts, or encourage by words or gestures, the actual, absolute perpetrators of the crime, in the commission of the offense. (Art. 75.)

Third. Those who, not actually present, keep watch so as to prevent the interruption of those engaged in committing the offense. (Art. 75.)

Fourth. All who, whether present or absent, engage in procuring aid, arms, or means of any kind, to assist in the commission of the offense, while others—the perpetrators—are executing the unlawful act. (Art. 76.)

Fifth. Persons, whether present or absent, who endeavor at the time of the commission of the offense, to secure the safety or concealment of the offenders. (Art. 76.)

Sixth. All who advise or agree to the commission of an offense, whether they aid or encourage those actually engaged in the commission of the offense or not, if present, are principals. (Art. 78.)

I will not at this point treat of the principals mentioned in Article 77, but will notice them before I conclude.

The writer has agreed to and expressed views, which will be

found in the opinions of this court, at variance with the doctrine here stated; but, after a more thorough investigation of the subject, I have come to the conclusion that the views here expressed are correct, and that those elsewhere expressed are wrong.

Applying the rules here stated to the facts of this case, was there any evidence tending to show appellant as principal in the offense charged? Is there the slightest fact, even presumed from other facts, to show that defendant, M. M. Smith, either kept watch, engaged in procuring aid, arms, or means of any kind, to assist in the commission of the theft; or that, at the time of the commission of the offense, he endeavored to secure the safety or concealment of the offenders? None whatever. It is conceded that he was not present, but at home, some forty or fifty miles from the place of the theft.

But let us concede that my views as to what is necessary to constitute a party a principal, are wrong, and that the doing of other acts besides those mentioned in the code may make the actor a principal, and that our opinions on this subject are correct when viewed with relation to the facts of each particular case, still the question occurs, are there any facts in this record which bring the appellant within the rule announced by this court in any case holding him a principal? Are there facts in this case which make or tend to constitute appellant a principal under the rules stated in any case upon this subject? If there be, I have not been able to discover them.

As before stated, the theory of this prosecution is that M. M. Smith conspired with others to steal the cattle, and that Jim and Dave Smith, and perhaps others, went to Erath county, took and drove the cattle to Parker county, and there delivered them to appellant; that Jim and Dave Smith and the others were co-conspirators with appellant, and that they were the guilty takers, the actual captors, while appellant at the time of the taking was engaged in the doing of some act in aid of those actually engaged in the taking; and hence that appellant was a principal. Let us concede this; still there must be proof to sustain this theory. The State, however, failed to make proof of the last mentioned proposition, to-wit, that appellant was, at the *time* of the *taking*, rendering aid or assistance to those engaged in the fraudulent taking. Upon this theory, therefore, the State has failed to make out its case.

Is there another theory, depending upon the guilt or innocence

of the actual takers of the cattle, presented by the facts, upon which the appellant might have been legally convicted if it had been presented to the jury by proper instructions? I think so. I stated, *supra*, that I would notice Article 77, bearing upon the subject of principals. Now let us suppose that M. M. Smith, intending and contriving to deprive the owners of the cattle in question, and to appropriate them or their value to his own use, induced Jim and Dave Smith, or others, to believe that the cattle were his property, and so believing, they or either of them went to Erath county, as the employes of M. M., and honestly and in good faith took the cattle as the property of M. M. Smith. Would M. M. Smith be an accomplice in this transaction? By no means, for there can be no accomplice without a principal offender. An accomplice necessarily presupposes that there is a principal—at common law, a superior. (4 Bl. Com., 34.) Sir William Blackstone upon this subject says that if a person, by laying a trap or pitfall for another, whereby he is killed, or letting out a wild beast with intent to do mischief, or inciting a madman to commit murder, so that death therefrom ensues, that in every such case the party thus offending is a principal in the first degree. "For," says he, "he can not be called an accessory (accomplice); that necessarily presupposes a principal."

But under our statute is a party employing an innocent person —innocent of the guilty purpose of the employer—though such person be subject to punishment, be of sound mind and discretion, be of years of maturity, and liable to be punished to the full extent of the law—liable as a principal offender? That such a person is a thief there can be no doubt, and if a thief, evidently he is the principal, there being no other guilty party to the transaction. If the trap, the pitfall, the wild beast, or the madman be the instruments of death—the means used by the murderer to commit the murder, etc.—may not a rational, responsible person also be the innocent means of others, through, or by whom, crime can be committed?

Article 77 provides that if any one, by employing a child, or other person who cannot be punished, to commit an offense, or by any means, such as laying poison where it may be taken, * * * or by any other indirect means, cause another to receive an injury to his person or property, the offender by the use of such means becomes a principal. It is remarkable that in treating of a *person* as the means, Blackstone names a madman, and our statute a child or a person who cannot be punished, and this

fact misled the writer in Lott's case, decided at this term of the court. (20 Texas Ct. App., 230.) However, after a more thorough investigation of the subject, I reach the conclusion that, if a person employs a perfectly responsible man or person to commit acts constituting crimes, and that the person employed is ignorant of the unlawful intent (in this case the fraudulent intent), the person so employing such party is guilty of the offense—guilty of the acts committed by his innocent agent; that such person is merely the instrument used by the guilty party—the employer—and that the acts of such innocent agent are the acts of the principal. Hence, if Jim Smith and Dave Smith took the cattle, honestly believing them to be M. M. Smith's, without knowledge of his thievish intent, they would not be guilty, but M. M. Smith would be. Jim and Dave would in such case be the means resorted to, the instruments used by M. M., and their acts would be his acts.

Again: In such case M. M. would be a principal necessarily, but if Jim and Dave were guilty co-conspirators with M. M., he, having advised, commanded, or employed them to commit the offense, and not being present, would at common law be an accessory before the fact, and under our code an accomplice. Upon this subject Mr. Bishop says: "INNOCENT AGENT—Such an agent is one who does the forbidden thing, moved thereto by another person, yet incurs no legal guilt, because either not endowed with sufficient mental capacity, or not made acquainted with the necessary facts." (1 Crim. Law, sec. 310.)

"To be a principal he need not be present at the perpetration of the wrong. Thus a dose of poison, or an animate object like a human being, with or without general accountability, may produce death or other injury in the absence of him whose will set the force in motion, and in such a case the absent person is a principal, whenever the immediate actor is not guilty in the particular transaction. If the immediate actor is guilty, the other, being absent, is only an accessory." (Id., 651.)

It will be seen from these questions that if the instrument be a person (though subject to punishment; competent in every respect to commit the offense if he has knowledge of the guilty intent of his employer) who is innocent, who acts in ignorance of his employer's guilty purpose and design; the employer, his principal, would be guilty, the agent's acts being his acts. He is guilty not as an accomplice, but as *principal offender*. If, however, his agent is a co-conspirator, has knowledge of his em-

ployer's felonious or fraudulent intent, he, the agent, becomes the principal, and the employer the accomplice, unless the employer be a principal by reason of some other of the provisions which are discussed *supra*.

To condense:—If A., intending to fraudulently deprive B. of his stock, and to appropriate the same or its value to his own use and benefit, employs C. to take such stock, C., being ignorant of A.'s fraudulent intent, and hence innocent of a fraudulent taking, and C. takes said stock from the possession of B., A. would be guilty of the theft of such stock, and be guilty as a principal. But if C. has knowledge of A.'s fraudulent intent, and takes the stock, C. would be guilty of the theft as principal, and A., not being present, would be guilty of the theft as an accomplice, these being all the facts bearing on the question of principal *vel non*.

These propositions render the insertion of a count charging M. M. Smith as an accomplice of the highest importance, for, if Jim and Dave be guilty, M. M., under the facts, is an accomplice. If they are innocent, M. M. may be guilty as a principal.

Now, in this case M. M. Smith has been convicted as a principal, with Jim and Dave Smith as the guilty takers, without evidence that M. M. was doing anything at all in aid of the taking. This is erroneous; for the theory that Jim and Dave may have been innocent agents, and that M. M. used them as the means or instruments by which to accomplish the theft, was not submitted to the jury.

*Affirmed.*

Opinion delivered March 23, 1886.