# APRIL 9, 1941

ARTHUR BLACK and UCLOUS WRIGHT V. THE STATE.

No. 21567. Delivered April 9, 1941.

The opinion states the case.

*B. F. Whitworth,* of Linden, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The appellants were convicted on a charge of theft by false pretense of property over the value of $50,00, and given a term of five years in the penitentiary.

The scene of the crime charged was near Kildare, Cass County, which borders an East Texas Oil Field enriched in its history by the presence of the colored population in multiple numbers and who possess such financial interests as to attract the wicked wooings of the wisest men. The story told is characteristic of the time and of the community in which the scene is laid, as well as the race involved.

It was September. The aroma of new mown hay had sweetened the breath of the evening. The lengthening shadow of the tall pine from the hilltop had extended into the green valley below. K. Willard Brown, colored, armed with a hay rake

and pitchfork, had set his affections on the closing task of the day and was about to garner his pea hay when he discovered two strangers at his door, "Dr. Mathis" and "Mr. Grumbles," erstwhile Arthur Black and Uclous Wright, colored. Dr. Mathis was a small, humble man, so he confesses, but in the spirit of the Lord he is able to do mighty things. In fact, the spirit, aided by a large blue Oldsmobile and Mr. Grumbles as chauffeur, together with the conception that K. Willard Brown might have eighty-two dollars, had led the doctor unerringly to the door at that very logical time of the day. K. Willard was appaled at the introduction. He met Dr. Mathis, who said, "I am a spiritual man and the spirit teaches me there is a hidden treasurer here." K. Willard: "Is that so?" To which he received the solemn reply, "Yes." Dr. Mathis: "I am nothing myself, but through the spirits I can do lots of things; the spirit leads me here. There is a hidden treasure here." K. Willard, seeking more faith: "Are you sure it was a spirit?" Dr. Mathis replied, "Yes, I am a spiritual man."

Now at this juncture a most unusual thing, to the uninitiated, occurred. K. Willard Brown, enrapt as he was by the announcements and by the presence of the select and the elect, nevertheless, displayed his loyalty to his pea hay and opined that he must hurry and rake it up as he saw a small cloud appearing in the distance. Dr. Mathis and Mr. Grumbles uttered not a dissenting voice, for who does not know and appreciate the loyalty of an East Texan, white or colored, to his black-eyed peas and all the by-products therefrom? Come riches and promise of riches, oil and promise of oil, the spirits nor spirituality has ever led one single East Texan for a moment to desert his blackeyed peas, and so, entranced as K. Willard Brown was by the presence of the mighty and the Almighty, he, nevertheless, must have a few minutes to prepare and look after his pea hay. Dr. Mathis and Mr. Grumbles assented: "Mr. Brown, you are kinda an industrious fellow, looks like you work awfully hard."

They sat patiently on the gallery until Brown's wife called him to supper. Dr. Mathis and Mr. Grumbles were too near the spirit to leave it to partake of food. They waited still. K. Willard soon joined them on the porch and it was not long until Dr. Mathis "sprung up" and said: "The spirit is dealing with me. Have you got a secret room?" K. Willard replied, "No, I have a company room." Said Dr. Mathis, "Suppose we go inside, and I would like to go through my business with you." They did. Chairs were arranged and "Dr. Mathis knelt down

to pray, and when he got up he said, 'Yes, it is here. The spirit directs me—it is here." K. Willard followed him in mind if not in spirit. Yes, he was ahead of him. He asked, "Who is it for?" Dr. Mathis' answer was ready, it was psychological. "I don't know, but however who it is for, the spirit will write you a letter, ever who the treasure is for." His eyes wandered to the east corner, with his head up, his tongue reverberating laudable but mysterious sounds from the unknown. Mr. Grumbles pantomined for emphasis. Dr. Mathis prayed again and, being assured, he spoke as never man spoke, "No mistake, the spirit directs me, it is there." To his Bible and to an appropriate chapter—it is immaterial where. K. Willard was in the spirit, but his heart was leaning further towards the treasure soon to be revealed. Reading and praying they proceeded until the spirit placed in the hands of the mysterious Dr. Mathis a piece of paper which he twisted up, read and set afire. The ashes were carefully placed on the Bible and rubbed, from which there appeared, "$7,000.00, north east of my house two and one-half feet in the ground." A little space below came the over-shadowing announcement, "It is $82,000.00 on the opposite side of the house." Dr. Mathis read the words—then the additional message, "You are welcome to the consecrated funds, J. W. Brown." (Strange wasn't it that the spirit made a mistake in the initials, or perhaps the court reporter.) The pronouncement of Dr. Mathis, the interpreter of the spirit, the man spiritual, brings to K. Willard the thrill that comes but °once in a lifetime. "Brother Brown, you should be proud. That treasure is for you." Laying his hand on K. Willard's shoulder he blessed him and spoke of the consecrated fund. Mr. Grumbles jumped up and turned to the other side of the house and, after talking in tongues, turned and said, "Brother Brown, get a glass, get a glass." It was produced half full of water. Something was poured in it which turned it black like smoke. So directed, he threw that out at the east end of his porch.

Dr. Mathis to his Bible again. From it the consecrated fund was explained. K. Willard offered him a check for the $82.00, one dollar for each thousand which was to be his, to which Dr. Mathis replied, "No, Brother Brown, we could not use a check. Jesus Christ is sending you the money and it will take cash money to get it—$82.00." K. Willard was to furnish that, but Jesus could not use a check. "You know, Brother Brown, it takes money to get money." Then he inquired how much money he had available. Four or Five Dollars was the reply, but that was not enough. Desiring to remain always in the spirit, (at

least until he possessed the $82,000.00) K. Willard implored his benefactors to leave him not until they should go to Atlanta and get the money, but their business was too important. They had other engagements the following day until late in the afternoon. Day light again. K. Willard's faith failed him (or perhaps the banker instead). He lingered in Atlanta until near nightfall. When he returned, the spirit, the big blue Oldsmobile and the hope of the $82.00 had led Mr. Grumbles and Dr. Mathis to their waiting on the porch. The chores were done because there was no hurry in a matter like this. Dark came on, supper fixed. Dr. Mathis and Mr. Grumbles, much in the spirit, fasted still. The conversation resumed. Dark brought Dr. Mathis in the spirit again. To the room, this time the one in which K. Willard slept. A lamp light would not fit the occasion, but a dim, tapering candle on a snuff box sufficed. Three small bottles on the hearth in the shape of a star with candles between them. Kneeling he prayed. Again the unknown tongues. K. Willard kneeled with him. His hand on the Bible, together they prayed, asking K. Willard about the consecrated money. He had only $52.00, which he took out of his pocket and gave to Grumbles to count without telling the amount. "Fifty-two dollars," he said, "Brother Brown, this is not enough." K. Willard's faith was rising and he told him he could get four more dollars, which he proceeded to do, but K. Willard spoke in an unknown tongue—at least to Mr. Grumbles and Dr. Mathis. He coughed and this was a signal. The sheriff and his deputy entered and took possession of Mr. Grumbles and Dr. Mathis, hence forth to be known as Arthur Black and Uclous Wright, or vice versa, it matters not.

Now it developed that K. Willard's faith had become adulterated during the day with a stream of doubt, and as night came on he feared he would not be successful by himself in struggling with the spirits, so he had procured the assistance of a neighbor who had called the sheriff to aid him. To the $22.00 which he secured from his wife he added $30.00 which he borrowed from the sheriff. It was not an entrapment case. K. Willard meant it. He was in the spirit, but the flesh was weak and he called the sheriff to help him, who sensed the situation and instructed K. Willard to cough when they had taken the money. The details here become pertinent. After the money, $82.00 as directed, should be placed, Dr. Mathis and Mr. Grumbles would retire for five days, during which time they would pray and at the end of which they were to return and dig for the money, but the evidence is not clear as to what was done

with the $82.00. The witness said, "I did not put the $52.00 in the Bible and put it in my bed tick and I didn't pray over it every night for five nights. I didn't do it because there was no need—the man was in jail." From this it appears, as the only evidence showing where the money was to be kept, that it was to be put in K. Willard's Bible and in his bed tick and there to remain (?). The sheriff testified, "I also found $52.00 in that room there, in paper money, currency of the United States." Further: "When I went in the room the $52.00 was lying on the table, or dresser, or washstand. One negro was on one side and one on the other side, and the money was lying on the Bible. There were two Bibles there and I believe the money was lying on K. Willard's Bible. We heard the negroes counting the money."

At the close of the testimony in this case the appellants' attorney timely moved the court to instruct the jury to return a verdict of not guilty. For his failure to do so; bill of exception properly brings the matter before this court for consideration.

Definitely, K. Willard coughed too soon. The deal was not quite closed. Appellants had not appropriated the money, and for this it is our judgment that the case must be reversed. Price v. State, 91 S. W. 571, is sufficient authority for our holding. It has been followed by Nichols v. State, 109 S. W. (2d) 1057; Maxwell v. State, 115 S. W. (2d) 939, all of which are in harmony with the following discussed authorities:

The prosecution is under Art. 1413 P. C. reading as follows:

"The taking must be wrongful, so that if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft, but if the taking, though originally lawful, was obtained by any false pretext, or with any intent to deprive the owner of the value thereof, and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is complete."

In the case of Barnett v. State, 43 S. W. (2d) 449, we find the following language used by the court:

"The gravamen of the offense of theft by false pretext is that accused came into possession of the property by a willing surrender of it to him by the owner, he, however, being induced to so deliver possession by a false pretext or device, and with the fraudulent intent on the part of accused at the very

time he came into possession of it to appropriate it to his own use, followed by such appropriation."

In the case of Hoovel v. State, 69 S. W. (2d) 104, this court laid down the following as the constituent elements of theft by false pretext:

"The constituent elements of theft by false pretext consists, first, in the obtaining of property by means of a false pretext; second, that at the time the property is obtained the accused had the intent to deprive the owner of the value of the same and to appropriate it to his own use and benefit; and third, that, pursuant to said intent said property was appropriated by the accused to his own use and benefit without the consent of the owner."

In the case of Gordon v. State, 214 S. W. 980, opinion by Judge Morrow, it is said:

"In theft, the acquisition of the possession by the false pretext is sufficient, if done with the intent to appropriate, and followed by an appropriation."

The case of Gibson v. State, 214 S. W. 341, opinion by Judge Lattimore, cites with approval and quotes from the early case of Hornbeck v. State, 10 Texas App. 408, as follows:

"To constitute the offense as defined in this article, the taking being originally lawful, possession must be obtained by some false pretext, or it must be obtained with an intent existing in the mind of the taker, at the time the possession was obtained, to deprive the owner of its value and to appropriate the property to the use and benefit of the taker, and, besides these requisites, such a taking would not be complete so as to constitute the crime of theft, until the taker has so appropriated the property to his own use and benefit."

Concluding that the State has failed to show appropriation of the property as an essential element of the offense for which the conviction was had, the judgment of the trial court is reversed and the cause remanded.