BOB HOLT V. THE STATE.

No. 21744. Delivered March 25, 1942.
Rehearing Denied April 22, 1942.

HAWKINS, Presiding Judge, dissenting.

The opinion states the case.

*D. F. Sanders* and *J. A. Veillon,* both of Beaumont, for appellant.

*Melvin Combs,* District Attorney, and *Joe H. Tonahill,* Assistant District Attorney, both of Beaumont, *Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Appellant was charged with theft by false pretext and, upon allegations of prior convictions in accordance with Article 63 of the Penal Code, was given a life sentence in the penitentiary.

Appellant and three others, acting together, consummated the theft of $20,000.00 by false pretext from C. E. Goolsbee and

wife, who live in Tyler County, a distance of forty-two miles from Beaumont. In January, 1941, the appellant, under another name than Holt, appeared at the store operated by Mr. Goolsbee in the town of Warren. He made inquiry about some land which he wished to lease for oil and gas purposes, claiming to represent a Mr. Blackwell whom he said was in a hotel in Beaumont and was the very man for whom the town of Blackwell, Oklahoma, was named. He described him as being in the oil business, but an old man and not too active. He made several calls on Goolsbee, appearing with one of his co-conspirators named Ramey and introduced him by another name. Ramey soon took up the role as the chief actor in the oil deal and also in the theft for which they are charged. It is our conclusion from the testimony that the transaction regarding the lease was a hoax, having for its purpose gaining the confidence and securing the presence of Goolsbee and wife at a time and place and under circumstances favorable to the deal by which they secured the $20,000.00 as will be shown by a further statement of the evidence.

Appellant and Ramey agreed on a price for the lease, subject to Blackwell's approval, but returned the following day and reported that Mr. Blackwell would not agree to the price. They continually called and persuaded Goolsbee and wife to go to Beaumont for the purpose of seeing Mr. Blackwell and closing the deal. Finally this purpose was accomplished. When they arrived at the hotel they saw appellant in the lobby, who told them that Mr. Blackwell was busy and could not see them for nearly an hour. He then directed that they return to Ramey's car and remain in it, promising that he would bring Blackwell as soon as he was available to the car and close the deal. He didn't stay at the car nor within sight of it all of the time, but made a return trip and reported that Blackwell had come into the hotel and would buy the lease at the price which Goolsbee and wife had asked, but that he was still busy. He said further, "It will be O. K. and not later than Tuesday we will put the money in the bank to get the title fixed up." His visit was brief, but it was during the negotiations by which the other three conspirators were extracting the money from Goolsbee and wife and while at least one of them was present. It is not in evidence that he heard what was said, but his presence there, under all the circumstances, indicates that he was at all times nearby and advised as to the progress his associates were making.

During the period of time that the parties were waiting in the car and prior to appellant's visit to them there, an envelope supposed to contain valuable papers was planted in the gutter nearby and was discovered by Ramey, the same man who had been appearing in the town of Warren with appellant and who had theretofore assumed a leading role in pushing the deal for the lease. The papers in the envelope were examined and contained a check for $500.00, together with papers showing extensive market transactions. A man appeared on the scene looking as if he was searching for something lost. Mrs. Goolsbee asked him what he was looking for and he replied that he had lost an envelope containing papers very valuable to him. Upon being required to do so he was able to describe with exact details the contents of the envelope, thereby convincing Ramey, who was rather skeptical, together with the more credulous Goolsbee and wife, that he was the rightful owner of the papers and repossessed them. After expressing in a very gracious manner his gratitude for their kindness in giving his papers to him he tendered fifty dollars as a reward, which was refused first by Ramey and then by the Goolsbees. More compliments to southern honesty paved the way for Ramey's suggestions that he might give them a tip on the markets. This was his weak point. He knew and was willing to do that for people like them. He even trusted Ramey with $500.00 with instructions to go into the hotel to the stock exchange, which in fact did not exist, while he remained at the car with Goolsbee. Ramey followed instructions, doubled the money and brought it back in cash to be exhibited. The profits were tendered, share and share alike, to the four of them. Ramey gave a glowing description of the stock exchange and the vast amount of money with great numbers of men and women there dressed in fine clothing. The transaction was pyramided. It was while they were waiting for the completion of another transaction that Holt appeared and, apparently for the purpose of holding the victims present while his associates completed the transaction, made his report on the return and agreement of Mr. Blackwell. Appellant's acts and his presence were utilized for the purpose of carrying on and completing the transaction culminating in the theft of the $20,000.00. Details are not of further importance. It was accomplished. They secured the $20,-000.00 for temporary use in closing up a stock deal whereby they were to get $77,500.00, a large percent of which was to be given to the Goolsbees after the return of the $20,000.00 which they secured from their bank and placed with the parties.

Finding an excuse to recess on the deal, the parties disappeared and were located some days afterwards and arrested, developing the fact that appellant and others were going under assumed names. It also developed that they did not represent Mr. Blackwell and if such a man lived he was not in Beaumont, or at least not in the hotel; that no stock exchange was located there; that each and everything which had been said to them by appellant and others was done for the purpose of securing by false pretense the money involved. Appellant and his wife were arrested in Houston on instructions from the Beaumont officers. She had something over Two Thousand Dollars, including two $500.00 bills which were positively identified by the serial numbers as a part of the money delivered by the bank to Goolsbee and by him to appellant's associates. Appellant had on his person some $20.00 bills, together with a receipt showing that on the very day of the transaction by which Goolsbee lost the money he had paid $500.00 to an automobile firm in Houston. Appellant was not present when the money was actually delivered nor at any time after he reported that Blackwell had returned, that the trade would be closed and the $25,-000.00 paid to them on the following Tuesday. He did not discuss with them the stock transaction nor advise them in that respect, but there is no explanation of his visits to them and of the transaction which he had, other than the purpose which developed in the stock transaction. From the date he made his first visit to the town of Warren and on each call thereafter he was seeking to place them in position to be victimized. By his last call on them in the car while the transactions were going on, he contributed to holding them present and naturally aided in inducing them to make a quick investment of the money already on hand by his solemn promise of a delivery by a certain time of $25,000.00 for a lease on their land. He was the man who originated the transaction with them, aided in it continuously by playing into their confidence and securing their presence.

Admittedly, the transaction as described constituted the offense of theft by false pretext. (Gordon v. State, 214 S. W. 980, 85 Tex. Crim. Rep. 641; Hoovel v. State, 69 S. W. (2d) 104, 125 Tex. Crim. Rep. 545; Nichols v. State, 109 S. W. (2d) 1057, 133 Tex. Crim. Rep. 294; Maxwell v. State, 115 S. W. (2d) 939, 134 Tex. Crim. Rep. 314; Black, et al v. State, 149 S. W. (2d) 968.)

The question presented on the appeal, which has called for the most serious consideration, is whether or not appellant was a principal, as charged, or an accomplice. It is true that not all parties to a conspiracy may at all times be principals to a crime as contemplated. Branch's Penal Code, Sec. 700; Burow v. State, 85 Tex. Cr. R. 133, 210 S. W. 805; Anzualda v. State, 27 S. W. (2d) 231. It will further be conceded that in order for the evidence to be sufficient to authorize the conviction under the indictment in this case there must be some testimony or circumstance sufficient to show that at the time the offense was committed by the other conspirators appellant was doing something in furtherance of their common design.

Two views may be taken of the case. One would narrow the commission of the crime to the very minute the money was delivered by Goolsbee to Ramey and the others. We think the correct view is that the time of the crime of theft by false pretext extended from the beginning of the transaction when appellant first visited the Goolsbees until their loot was divided and that the place was in Warren, Tyler County, as well as near the hotel in Beaumont, Jefferson County. It follows from the facts of the case that appellant was personally present on several occasions, even while the parties were in waiting for the completion of the transaction by which the money was extracted from them. His return to the car and his report of the acceptance of their offer to lease the land, together with the promise that the money would be placed in the bank in just a few days, were all factors in the commission of the offense of theft by false pretext as charged in the indictment.

The question before us is one upon which minds may not seriously differ on abstract questions of law, but from a reading of the authorities it appears that its application is not without difficulty. Judge Ramsey, in the case of Bass v. State, 127 S. W. 1020, has discussed the matter in a very appropriate way for the consideration of the case at bar in the following language:

"The testimony does raise the issue that appellant was not present at the immediate time of the killing. His own testimony, as well as that of Mrs. Garcia, is to the effect that he was some 100 yards or more from the tent at the time the guns were fired. Ordinarily this fact might raise the issue of an accomplice; but, when considered in connection with other evidence, it cannot do so. There has been much discussion in the

books of what is an 'accomplice,' and what is a 'principal.' *One of the tests is that the person charged who was not present at the time the offense was actually committed, but that is subject to this qualification: If the party charged, though not actually present, is engaged in or is doing something in the chain of causation which leads up to the offense and is a necessary part of its accomplishment, he is a principal, though he may not be at the immediate time actually present.* Here, under the testimony of the State, it was appellant's duty and office to go to the tent, spy out the land, locate the parties, ascertain their unprepared condition, and give signal and notice to his associates. If he did this, though he may have been 100 or 200 yards from the scene of the difficulty, he would nevertheless, under the law, be a principal. This we understand to be the clear holding of the court in the case of Dawson v. State, 38 Tex. Cr. R. 50, 41 S. W. 599. It is undoubtedly the conclusion reached by Judge White in the case of Smith v. State, 21 Tex. App. 107, 17 S. W. 552, where it is said that *an accomplice is one whose acts are all performed before the commission of an offense,* while a principal may not only perform some antecedent act, but when the offense is actually committed is doing his part of the work in furtherance of the common purpose. While some of the later opinions have criticised this case on this question, the discussion by Judge White is so lucid, clear and satisfactory as to carry conviction of the correctness of this proposition."

Again, it was said by Judge Lattimore on motion for rehearing in the case of Jones v. State, 64 S. W. (2d) 789, in discussing this same question:

"The test in such case seems to be: Were the parties acting together when the crime was committed, each doing some part in the execution of the common purpose and design? Parties evidently might be principals, though physically widely separated at the moment one or more of them strikes the blow, or breaks the house, or takes the loot. In the case before us each of the three persons charged had arranged and agreed to do his assigned part, though only one of them was personally present and acting in the extraction of the property from the money box in which it was placed in the car. All of said parties were notified of the date when the money would be on the train, and the place and time when same should be taken. Poland, on the train when the money was to be carried, was to give an agreed signal indicating that the surroundings were suitable;

Bass, in possession of the key which would unlock the strong box, was to board the train, unlock the box and get the money; appellant was to be ready and nearby to carry Bass and the money to some place of safety. From this record it appears that Poland gave his signal; Bass got the money and carried it away, as the state contends, in appellant's car and with his assistance."

Other circumstantial evidence is quoted to warrant the jury finding that Jones, while not present when the money was taken, nevertheless, was some distance away waiting for Bass and did receive and transport him and the money. Poland was on the engine with the fireman and engineer, a distance away from and out of the view of Bass who actually committed the theft from the car, but there is no evidence that Jones was personally present or within sight of the party actually committing the theft, and that a case is presented definitely holding that where the parties acted together when the crime was committed, each doing some part in the execution of the common purpose and design, each one so acting was held to be a principal.

In accordance with the foregoing cases it is not a new doctrine to hold that Holt was properly charged as a principal. Not only had he been personally present many times and aided in operating on the victim by making false pretenses, but he was nearby when the money was actually extracted from Goolsbee; was by his act and conduct at the very time making false representations to keep them in position so that his associates could extract the money. He was playing his part at the very time it was done as much so as if he had been sitting in the car with them and thus fulfilled the requirements which this court has consistently made to constitute him a principal in the commission of the offense.

Our esteemed Presiding Judge differs with the majority opinion in this case, but we again insist, as in the case of Hardie v. State, 144 S. W. (2d) 571, that there is no difference between us as to the law of principals nor as to the holding of this court on the subject. We simply differ on the application of a well understood law to the facts of the case before us and recognize that there may be frequent cases in which the distinguishment between principals and accomplices may not be made without great difficulty. The fact of our difference in

opinion, as well as the nature of the question, has caused us to read many authorities not herein referred to and to search carefully for what we believe to be the proper conclusion in the matter.

While it is not essential to hold that theft by conversion is a crime which continues beyond the instance in which the property is being actually taken in possession in order to include the acts of false pretense to meet the requirements of law in this case, it does occur to us that such is, of necessity, true. Of course, the crime would not be complete unless the money was actually taken regardless of what constitutes the false pretense. There would be no theft by false pretense without the actual taking of the property. On the other hand, it would simply be theft were the false pretenses not shown, making it essential to include within the definition of theft by false pretext both the taking and the false pretext. If this view is accepted there would be no question about the correctness of our conclusion. The facts of this case go further and show that at the very time the money was being taken appellant was nearby, playing the part which the circumstances clearly indicate were assigned to him. Such being true, it appears that we have reached the inescapable conclusion that the case comes within the doctrine laid down by Judge Ramsey in the Bass case and by Judge Lattimore in the Jones case above quoted.

Following this, which we think to be sound, it appears to be perfectly clear that appellant was properly charged as a principal. (The Smith case referred to by Judge Ramsey may also be found in 17 S. W. 552, and is enlightening.)

We have concluded that the arrest and detention of appellant and his wife as suspicious characters was justified under Article 2, Section 1542, ordinances of the City of Houston. It also justifies and makes proper the search resulting in the finding of the money heretofore referred to. (Article 325 Code of Criminal Procedure.) It appears that the statement made by Thavanow to his landlord shortly after the theft indicated a flight from the scene of the crime and was admissible.

Exception was taken to the court's charge on the ground that the court failed to instruct the jury as to the law of principals, saying the court instructed the jury, "That they can find the defendant Bob Holt guilty if acting with others without designating who the others are." Further complaint is made

that the charge authorizes the jury to find Bob Holt guilty, if acting alone or in conjunction with others to obtain possession of $50.00 or more, and he appropriated said money, without instructing them that the others with whom he acted must also appropriate a part. We quote from the court's charge as follows:

"Therefore, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Bob Holt, acting alone or in conjunction with others, if there were others, with common design and intent to obtain possession of the Twenty Thousand ($20,000.00) Dollars, or any sum in excess of Fifty Dollars, current money of the United States of America, from C. E. Goolsbee and Ella Goolsbee, by false pretext, and with intent on the part of him the said Bob Holt and others, if there were others, to deprive the owner of the value thereof and to appropriate said money to his or their benefit * * *."

The indicment in this case charges the appellant with the commission of the offense and does not name his co-principals. Admittedly, this is sufficient to admit evidence as to others acting as principals. Had it named the co-principals and the manner by which the accused became a principal, then it might have become incumbent upon the court to so limit the charge, but under the indictment before us the rule is different. In view of the evidence which has apprised the jury in a very definite and clear manner without any reasonable contradiction as to who the other parties were, we see no helpful purpose which could be served by naming them in the charge under the indictment of this case. Neither do we see any prejudice resulting to the party on trial by the manner in which it was given. It is the customary and usual way of submitting questions to the jury to first define the law involved and then apply it to the facts of the case. This, however, seems to be merely a custom and may be a commendable one in order that all of the elements of the law be placed clearly before the jury without unduly emphasizing the evidence of the case, but where all of the elements are clearly stated without infringing upon the jury's province to properly weigh the evidence, we have been presented with no reason for error sufficient to work a reversal of the case. It appears that the quoted section of the charge fairly does that. The authorities upon which appellant relies in his brief substantiate his contention that the court must charge on the law of principals and this we think he has done.

Complaint was made that the court did not charge the jury on the law of alibi. We find in the charge the following:

"If you have a reasonable doubt as to the presence of the defendant at the time and place of the commission of an offense, if any was committed, you will acquit him, unless you further believe and find that he acted together with others, if there are others, with common design and intent to commit the offense as alleged in the indictment."

This charge is subject to the complaint lodged against it by the appeal. However, the evidence on the subject is as indefinite and uncertain as the charge itself. Had there been positive testimony that the appellant was at another place and not at the scene of the commission of the crime during all of the the time his co-principals were acting in the matter, this charge would be reversible error. The only evidence on the subject is to the effect that appellant was in the City of Houston on the 7th day of February, 1941, at "about" 11:30 to 12:30. The witnesses admitted that the only way they fixed the date that he was there was by receipt which they had issued to him, and that there is nothing in the receipt to indicate the hour of the day. They testified to nothing fixing the time nor is it certain that he could not have been in Houston within this period of time and also have been in Beaumont at the time the State's testimony claimed that he was there, which was around nine o'clock in the morning. Consequently, we are of the opinion that the erroneous charge does not present reversible error under the facts of the case.

This disposes of the troublesome questions of the case. All others are overruled and the judgment of the trial court is affirmed.

GRAVES, Judge, (concurring).

Presiding Judge Hawkins having entered his dissent to the disposition of this case, I think it permissible to write my views in which I concur in Judge Beauchamp's opinion herein.

This is not an ordinary case of theft by violence and without the consent of the injured person, but it is theft with consent of such person, but a consent that was obtained by means of a false pretext. This conspiracy began some ten days or two weeks prior to the time the money was actually gotten from Mr. Goolsbee. About two weeks prior to such time, we gather

from the testimony, appellant Holt called on Mr. Goolsbee at his home in Warren, Tyler County, Texas, and gave the name of Franklin, which name was false, and said he wanted to lease some land for oil exploration purposes; that he was representing a man named Blackwell; that Mr. Blackwell was old, and was the same person for whom the town of Blackwell, Oklahoma, was named, all of which statements were false. That he would try and get Mr. Blackwell up to see Goolsbee. In about three days Holt (as Franklin) returned on a Sunday and merely paid a social call, Holt not doing business on Sunday. Holt came again about three days later and said he would try to get his mythical, so far as the record shows, employer to come to see Mr. Goolsbee, but Blackwell never came. Again, on the fourth trip appellant brought one Ramey with him, who was introduced by the name of Shelton, and Franklin (Holt) and Shelton (Ramey) then agreed with Goolsbee on the oil lease of about 2,500 acres of land in Trinity County at ten dollars per acre, and tried to get Goolsbee to go to Beaumont to see the mythical Blackwell; upon Goolsbee's refusal they agreed to try to get said Blackwell to come to Warren to see Goolsbee. Again these two persons returned to see Goolsbee, and told him that Mr. Blackwell said that they, Holt and Ramsey,— still known as Franklin and Shelton,—had agreed to pay too much for the oil lease, and wanted a split of the difference. Nothing came of this request. Then came a sixth trip in order to obtain the deeds of Goolsbee to the Trinity County land, and the obtaining of knowledge that title to a portion of the land was in Mrs. Goolsbee's name, again an effort was made to get the Goolsbees to come to Beaumont, as the said Blackwell wanted to meet Mrs. Goolsbee, and finally Mr. Goolsbee consented to come to Beaumont to meet Blackwell and negotiate relative to the oil lease, and these persons then told Goolsbee that they would use Mr. Blackwell's car and come to Warren and take the Goolsbees to Beaumont the next day. Ramey (Shelton) did come after them the next day and they came to Beaumont with him, and stopped across the street from the Hotel Beaumont. Mr. Goolsbee got out of the car and entered the hotel, and there found Holt (Franklin) and was told by Holt that Mr. Blackwell was in an oil conference at that time, and would be out in about forty or fifty minutes; that he was a busy man, many people wanted to see him, and he said "if you will go out there and wait in Ramey's (Shelton's) car, when Mr. Blackwell comes in I will catch him first thing when he comes, and bring him out to the car, and we will close our

trade; I will let him meet you people and close the trade out in the car; and we went back and got in the car, and Bob Holt, I don't know whether he came to the car or not, I think he did, but he went outside the lobby I know." After the parties, the Goolsbees and Ramey (Shelton) got in the car to wait for Blackwell, the old pigeon-dropping game was pulled on the unsuspecting Goolsbees, and two new conspirators came into view in the common design, Harris and Thavanow. After the supposed winning of $77,500.00 on the non-existent stock exchange in the hotel, and a visit of Harris to the car, the same car in which Holt had placed the Goolsbees, and where he was going to bring this same Blackwell to close the oil deal, Harris exhibited a large roll of money which he, as the stock exchange man, was going to pay to Ramey, Thavanow and the Goolsbees; he raised a question as to who should receipt for this large amount, and the signatures not being satisfactory, he finally agreed that if the parties would exhibit to him $30,000.00 in cash, he would then deliver this money to them. After it being shown that Ramey and Thavanow could only raise $10,000.00, these two gentlemen asked Mr. Goolsbee if he could not raise some funds, and eventually Goolsbee agreed to raise $20,000.00. In the meantime the stock exchange man had gone back into the hotel, ostensibly to his exchange, which was not there. Just about this time "Bob Holt, the defendant, came by the car and told us that Blackwell had come in, and Blackwell still was busy, but he says he will buy the land, lease the land at your price, and I believe that was on Friday, and he is busy and we will lease the land, and he said it will be O.K., and not later than Tuesday we will put the money in the bank and get the title fixed up." Soon after that Mr. and Mrs. Goolsbee, accompanied by Ramey and Thavanow, went to two banks and drew out the $20,000, the numbers of the larger bills being kept by the bank; they saw no more of Holt, but visited a room in the hotel, gave their money to Harris, who gave them in return some kind of order, but on account of Harris' "stock exchange" being closed and the vault locked up, the parties were to return the next day and get their $30,000.00 as well as their $77,500.00. Of course on the Goolsbee's return the next day no conspirators appeared, and upon opening the envelope, which had been left with the hotel clerk under lock and the key given to Mrs. Goolsbee, nothing save blank paper was found in the envelope.

It is our impression that appellant was the master mind in the whole transaction, and that from his first visit to this

small town storekeeper until the money was taken from Mr. Goolsbee with the successful fruition of his two weeks labor he was acting with and at all times furthering the common design and purpose of this elaborately laid plot.

The testimony shows two previous convictions for similar crimes, in one of which he was charged with obtaining in Arkansas $55,000.00, and in another he was charged and convicted of obtaining $28,000.00 in the State of Tennessee. Evidently he was experienced in such matters.

It will be observed that this is not an ordinary theft, where property is taken without the knowledge and consent of the owner. This is a theft where property is obtained with the consent of the owner, but the consent is gained by means of a false pretext. It might be summed up and said that practically every representation made to Goolsbee by Holt was false, but had its evident purpose and motive to get Goolsbee to come to Beaumont and sit in the car where Holt directed him so this scheme could be perpetrated upon him, and his consent could be obtained to the possession of this large sum of money.

I have thus set forth the salient facts in order to show that the jury was justified in finding that there was a concerted scheme and design between appellant and his confederates to obtain the presence of Goolsbee at Beaumont, and that the portion of such common design upon the part of Holt was accomplished by him while his companions were carrying out their portion of such scheme. Holt was in touch with them, still holding his victims in the net that he and his confederates had spread for them.

The dissenting opinion quotes the doctrine that "the mere fact that a conspiracy is shown does not make all parties thereto principals to the crime committed as a result of and as contemplated by the conspiracy," and quotes Branch's P. C., Sec. 700. It fails to quote a further paragraph of such section, which says:

"To constitute a person a principal in a felony he must at the time the act is being done, if not personally present, be then doing some act in furtherance of the common design."

The common design in this case impresses me as being the obtaining of money by a false pretext, not by violence, and at

the time of its obtainment, I think the master mind was not only near at hand but actually present just at or about the time the consent was given, and assisting in getting such consent by a false statement that on the following Tuesday he was going to pay the victim $25,000.00 for an oil lease on some Trinity County lands. I think it is easily discoverable from the facts herein presented that Holt, the master mind, was playing his part in the common design, not only from his acts prior to the receipt of the money, but also after same was received.

If there existed a conspiracy to obtain Mr. Goolsbee's money unlawfully, then any person who entered into such conspiracy prior to its commission and up to the time of the division of the spoils is guilty of all acts of any of the conspirators done in furtherance of the common design at any time until the division of the spoils obtained therefrom, and it is worthy of note that a portion of the marked bills given to Harris by Goolsbee was found in appellant's car, concealed on his wife's body. See Branch's P. C., Sec. 693, p. 352, and Sec. 695, p. 354, 3rd paragraph.

I do not think that the statement that the "time of the crime being in two counties is startling. Nor do I think any certain degree of proximity is demanded of one ere he can become a principal in a crime. As early as the 7 Tex. App. 361, Scales v. State, it was held that Mr. Scales, who lived in Clay County, confederated and agreed with two conspirators that they should go over into Wise County and steal some horses and bring them to Clay County, and all three confederates would take them to the Panhandle and sell them. At the time of the theft Scales was in Clay County. The trial court did not charge on accomplishship, but did charge on principals, and Scales was convicted as such, and this court held him to be such, although he was not in the county where the horses were stolen, but merely found in their possession in the Panhandle.

I think that in the case of Middleton v. State, 86 Tex. Cr. R. 307, 217. S. W. 1046, this matter has been fully and correctly discussed, which case has often been quoted, the burden of such discussion being relative to one's actual physical presence at the scene of the offense as the distinction between accomplice and a principal. Prior to that time and since we think the true doctrine that should be followed is found in Mason v. State, 31 Tex. Cr. R. 311, wherein it is said:

"Again, it is well settled that where it is proved that the persons charged by their act pursue the same object or purpose, one performing one part and another some other part of the same, so as to complete it with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object; and under our statute such acting together would make all principal offenders, whether bodily present or not at the place of the offense. And they are all principal offenders when acting and together, as long as any portion of the object of the common design remains incomplete; in other words, until the full purpose and object of the conspiracy is consummated and accomplished. Smith's case, 21 Texas Ct. App. 108; Willey v. The State, 22 Texas Ct. App. 408; Miller v. The State, 23 Texas Ct. App. 38; Collins v. The State, 24 Texas Ct. App. 141; McFadden v. The State, 28 Texas Ct. App. 241."

I think Judge Beauchamp's conclusions as to the law in this matter are based on the proper decisions of this court, and are borne out by the facts and common sense, and I therefore concur in the affirmance of this judgment.

HAWKINS, Presiding Judge, (dissenting).

In the distribution of cases after submission this case went to the desk of Judge Davidson, one of the Commissioners to the Court of Criminal Appeals. He reached the conclusion that the evidence was not sufficient to support the conviction of appellant as a principal, and prepared the following opinion. My brethren have reached a different conclusion from that arrived at by Judge Davidson. His opinion is as follows:

"The conviction was for felony theft, with punishment assessed at life in the penitentiary as an habitual criminal. (Art. 63, P. C.)

"This case presents another version of that old confidence game sometimes referred as 'pigeon dropping' or 'ring dropping.' (Wharton's Crim. Law, Sec. 2136.)

"It was the State's theory that appellant and three others, acting together, consummated the theft of twenty thousand dollars by false pretext from C. E. Goolsbee and wife.

"Sometime the last week in January, 1941, Holt, the appellant, appeared at the store operated by Mr. Goolsbee in the town of

Warren, about forty-two miles from Beaumont, and approached him relative to leasing some of his land for oil and gas purposes. He claimed to be representing a Mr. Blackwell, who was residing at a hotel in Beaumont. Goolsbee and his wife owned considerable real estate. At this time, only a general discussion between them occurred. The next day, or the day after, the same routine was carried out; then a few days prior to February 7th, 1941, Holt appeared at the store, this time accompanied by conspirator Ramey, whom he introduced, and the matter of the lease was pressed, Ramey taking up the burden. At this time a price for the lease was agreed upon, all contingent, however, upon Blackwell's approval. The following day they returned and reported that Blackwell would not pay the price they had agreed upon, and suggested that Mr. and Mrs. Goolsbee accompany them to Beaumont to see Blackwell, looking to an agreement as to the price. It was finally agreed that Mr. and Mrs. Goolsbee would go to Beaumont for that purpose, and February 7th, 1941, was set as·the date. Early on the morning of that day Ramey appeared to carry Mr. and Mrs. Goolsbee in his car to Beaumont; they arrived there at about nine o'clock in the morning and parked the car near the hotel; they went into the lobby, where Holt, who was in the lobby, advised them that Blackwell was busy and could not see them until later. The three (Mr. and Mrs. Goolsbee and Ramey) decided to return and to wait in the car. The appellant now appears to pass, temporarily, out of the picture. Upon the three returning to the car, Ramey discovered an envelope lying under the car, which he picked up. The envelope contained a check for five hundred dollars and papers showing extensive stock market transactions. About this time Thravanow appeared on the scene. He acted as though he were looking for something. Mrs. Goolsbee inquired of him if he had lost something, and he replied that he had lost an envelope containing papers very valuable to him. He, of course, was able to describe with much detail what was in the envelope, whereupon Ramey gave it to him. Thavanow was very grateful to them, saying that if he had not found the envelope he would have been ruined. He proffered to Ramey a fifty dollar bill as a reward, which was refused. As Thavanow was about to leave Ramey suggested that inasmuch as it appeared that he was well acquainted with stock market activities he might give them a tip on the market; and, as an act of appreciation for the great favor they had done him, he agreed to do so, and gave Ramey a five hundred dollar bill, instructing him to go

to the stock exchange in the hotel and buy certain stocks, which he described in a purchase order that he gave him. Accordingly Ramey left, leaving Thavanow there at the car with Mr. and Mrs. Goolsbee. A short time later Ramey returned, reporting that he had executed the order as directed. After a short period of time Thavanow suggested to Ramey that he go back and see if the stock had been sold. Ramey left and soon returned, exhibiting one thousand dollars, which he claimed to have made in the deal. He also gave a glowing account of the stock exchange and of the vast amount of money he had seen while there. The five hundred dollars profit was offered to be divided among the four. About this time Thavanow said he was to buy thirty thousand dollars worth of stock on the exchange for his company. He wrote out an order to that effect which he gave to Ramey, with instructions to execute same, and also cautioned him not to use the one thousand dollars they had. Ramey left, was gone for a time, and returned, saying that he had bought thirty-one thousand dollars worth of stock. Of course, Thavanow reprimanded him severely for using the one thousand dollars. All parties remained there at the car waiting for time to elapse for the transaction to be completed on the stock exchange. While thus waiting Holt reappeared on the scene and reported to Goolsbee that Blackwell had agreed to take the oil and gas lease, and, with this, passed on. After this, Thavanow suggested that Ramey go and see what had happened on the stock exchange. After being gone for some time, Ramey returned; with him came Harris, who purported to be the representative of the stock exchange. He and Ramey had with them what appeared to the victims to be a large amount of money, which they deposited in or tossed into the car. Harris advised Thavanow that he had made this money and that it amounted to seventy-seven thousand, five hundred dollars. Harris exhibited a ticket or order showing said sum as the amount due and to be paid, as also a receipt, which he asked Thavanow to sign. Upon examining the ticket Harris discovered that the transaction or purchase had been handled in the name of the firm or partnership which Thavanow represented. Harris then required that, before delivering the money he would have to have the signature of the other partner or member of the firm. Thavanow explained that his partner was not in town and that he could not get his signature. Harris expressed regret, but advised that the signature would be required before delivery of the money, and, with that, began to pick up

and to take charge of the money which had been placed in the car. Thavanow inquired if the matter could be handled in any other manner whereby he could get the money. It was agreed that, although it would be irregular, yet if Thavanow could raise Thirty thousand dollars in cash, Harris would turn over the seventy-seven thousand, five hundred dollars. With this Harris said that he would return to the exchange to await the raising of the money. Thavanow then suggested that he could get the money by wiring east for it; so he left for that purpose, leaving Ramey at the car with the victims. He later returned, saying that he had raised ten thousand dollars, and that he was going to wire to California. He later reported that he could get no help from that place. Ramey then suggested that he could raise five thousand dollars by wiring to Shreveport, but that with this they would still be fifteen thousand dollars short of the thirty thousand dollars required. Mr. Goolsbee was then propositioned if he could get that amount, and he replied that he could. Ramey then said that it would take some time to get his five thousand dollars; whereupon Mr. Goolsbee said he could supply the twenty thousand dollars. It was then agreed that if Mr. Goolsbee would put up that amount he would get twenty-seven thousand, five hundred dollars profit, or a total of forty-seven thousand, five hundred dollars, same being his twenty thousand dollars and the profit. This Goolsbee agreed to do, and he and Mrs. Goolsbee were driven to two banks in Beaumont where they drew from each bank ten thousand dollars in currency. One of the banks paid the money in bills of one thousand dollars and five hundred dollars denomination and retained a record of the serial numbers of such bills. All this time Ramey and Thavanow were outside the banks, waiting for them. Goolsbee and wife, with twenty thousand dollars, were carried to the hotel and into a room which Thavanow claimed was his. This was at something like one or two o'clock in the afternoon. After getting into the room Ramey left and returned with Harris, the pay-off man. The twenty thousand dollars was given to him and he gave the order for the seventy-seven thousand, five hundred dollars on the stock exchange to Ramey, telling him to come on up to the exchange and get the money. Ramey left the room with Harris while Thavanow remained in the room with the victims. Ramey soon returned, saying that the exchange had closed; that the money was locked in the vault, and that they could not get the money until the next day. It was then

agreed between Mr. and Mrs. Goolsbee, Ramey and Thavanow that they would meet at the hotel the next morning to get the money. The order for the money was to be placed in a sealed envelope in a lock box, at the hotel, overnight. The key to the box was to be retained by Mrs. Goolsbee. The order was placed in the envelope, with Thavanow in possession thereof, as they left the room. They went to the hotel clerk's desk and an envelope was placed in the lock box provided by the hotel, and the key delivered to Mrs. Goolsbee. A taxicab was called and Mr. and Mrs. Goolsbee were sent to their home. The next moning Mr. and Mrs. Goolsbee appeared at the hotel as agreed, but no trace of the others could be found. After waiting for a time the box was opened and the envelope was found to contain only a blank piece of paper. Thus this elderly couple was defrauded of their money. It seems incredible that such a thing could happen; yet that it what this record reveals did happen.

"Mr. Goolsbee was positive in his statement that at the time the money was delivered to the thieves it was under the agreement that the twenty thousand dollars was to be returned to him, together with the profit.

"There was no stock exchange in the hotel, nor were there any stock transactions. The representations relative thereto were false.

"Under these facts a case of theft by false pretext is presented. Gordon v. State, 214 S. W. 980, 85 Tex. Cr. R. 641; Hoovel v. State, 69 S. W. (2d) 104; 125 Tex. Cr. R. 545; Nichols v. State, 109 S. W. (2d) 1057, 133 Tex. Cr. R. 294; Maxwell v. State, 115 S. W. (2d) 939, 134 Tex. Cr. R. 314; Black, et al v. State, 149 S. W. (2d) 968.

"In addition to the foregoing facts the State, to further connect appellant Holt with the crime, showed the following: About a week prior to the crime Ramey and Thavanow rented a room in a private home in Beaumont, which they vacated on the afternoon the crime was completed. Appellant visited them at their room during their stay there, and was seen on occasions to leave the house in their company.

"On the night of February 10, 1941, or three days after the theft, the appellant and his wife while together were arrested

in Houston, Texas. Upon appellant's person were found two twenty dollar bills and hidden in the underclothing of the wife was something over two thousand dollars, of which there were two five hundred dollars bills, positively identified by serial numbers as a part of the stolen money. There was introduced in evidence a receipt bearing date February 7, 1941, the day of the theft, showing that on that day appellant had paid to an automobile firm in Houston, Texas, five hundred dollars on his car.

"Upon cross examination Goolsbee testified that appellant was not present when the money was delivered; that the last time he saw appellant was when he passed by the car and reported to him that the terms for the oil and gas lease had been agreed upon; that appellant never at any time mentioned to him any stock transaction, nor was he present when such transaction was being discussed by the others.

"Appellant did not testify as a witness in his own behalf, nor did he offer any affirmative defense.

"The sufficiency of the evidence to support the conviction is challenged.

"The primary offense of which appellant stands convicted is that of theft. This is not a case of, nor is he charged with the substantive crime of, conspiracy to commit theft, nor as an accomplice to the commission of that crime by others.

"Not being actually present when the theft was finally consummated and the money delivered, appellant's guilt is, therefore, made to depend upon an application of the law of principals. Under our statutes, there exist six different definitions by which one may be a principal to the commission of a felony by another. Middleton v. State, 217 S. W. 1046, 86 Tex. Cr. R. 307; Hardie v. State, 144 S. W. (2d) 571, 140 Tex. Cr. R. 368. As there pointed out, only two of these require the presence of the co-principal with the one actually committing the unlawful act. The four definitions not requiring presence of the accused are stated as follows:

" 'When A. actually commits the offense, but B. keeps watch, so as to prevent the interruption of A.'

" 'When A. is actually executing the unlawful act, and B. engages in procuring aid, arms, or means of any kind to assist while A. executes said unlawful act.'

" 'When A. actually commits the offense, but, at the time of such commission, is endeavoring to secure the safety or concealment of A., or of A. and B.'

" 'When A employs an innocent agent, or by indirect means causes the injury, or bring about the commission of the offense.'

In theft cases, a fifth definition is recognized where one may be a principal to the commission of a felony theft by another, although not present when the theft is committed, and that is:

"When A., being a party to a prior conspiracy to commit theft, and his part in the conspiracy is to make disposition of the property when stolen, and the proceeds of which are to be divided among the conspirators. Smith v. State, 17 S. W. 552, 21 Tex. Cr. App. 107; Kolb v. State, 228 S. W. 210, 88 Tex. Cr. R. 593; Smith v. State, 17 S. W. 558, 21 Tex. Cr. App. 133; Byrd v. State, 117 Tex. Cr. R. 489, 38 S. W. (2d) 332; Burow v. State, 210 S. W. 805, 85 Tex. Cr. R. 133; McInnis v. State, 122 Tex. Cr. R. 128, 54 S. W. (2d) 96; Coy v. State, 100 S. W. (2d) 1016; 11 Tex. Cr. R. 489; Miller v. State, 105 S. W. (2d) 1097, 133 Tex. Cr. R. 53; Thornton v. State, 127 S. W. (2d) 197, 136 Tex. Cr. R. 560.

"These definitions but furnish specific instances by which the basic fact necessary to constitute one a principal to the commission of a crime by another may be established, which is the acting together of the parties in furtherance of a common design in committing the offense charged. To meet this burden the State relied upon the circumstances shown. The trial court so recognized and instructed the jury upon the law of circumstantial evidence.

"It may be conceded that the facts established the existence of a conspiracy to commit the theft, and that appellant was a party thereto. But the mere fact that a conspiracy is shown does not make all parties thereto principals to the crime committed as the result of, and as contemplated by the conspiracy. Branch's P. C., Sec. 700; Burow v. State, supra; Anzualda v. State, 27 S. W. (2d) 231, 115 Tex. Cr. R. 509.

"So, for the State's case to be sufficient to authorize this conviction, there must be some testimony or circumstance sufficient to show that, at the time the offense was committed by the other conspirators appellant was then doing something in furtherance of the common design. We are unable to find in this record any fact or circumstance sufficient to show. Moreover, under the facts here rpesented appellant could have been a party to the conspiracy, and in possession of some of the stolen property recently after the theft, yet his absence at the time the offense was committed or was finally consummated would tend as strongly to show that he was an accomplice to the theft as it does that he was a principal thereto. Such fact would constitute such an outstanding hypothesis as would be required to be disproved by the State in order to sustain the conviction upon circumstantial evidence. To be sufficient to sustain this conviction, then, the facts must be sufficient to show not only that appellant was guilty as a principal to the theft, but also must disprove the fact that he was an accomplice to the commission of the offense by others.

"One cannot be both a principal and an accomplice to the commission of the same crime.

"The facts being insufficient to authorize the conviction, the judgment is reversed and the cause remanded."

I adopt the foregoing opinion as a dissenting opinion, with the following additional observations.

It must be remembered that appellant was charged as a principal in the theft by false pretext of twenty thousand dollars from C. E. Goolsbee and Ella Goolsbee. It is well recognized that one indicted as a principal may not be convicted under said indictment as an accomplice; neither may one indicted as an accomplice be convicted as a principal under said indictment. Article 70 of the Penal Code defines an accomplice as follows:

"An accomplice is one who is not present at the commission of an offense, but who, before the act is done, advises, commands or encourages another to commit the offense; or

"Who agrees with the principal offender to aid him in committing the offense, though he may not have given such aid; or,

"Who promises any reward, favor or other inducement, or threatens any injury in order to procure the commission of the offense; or

"Who prepares arms or aid of any kind, prior to the commission of an offense, for the purpose of assisting the principal in the execution of the same."

Opinions of this court have many times announced that an "accomplice" is one whose acts are all performed before the commission of the offense, and who is not present when it is committed. To constitute a person a principal in a felony, he must at the time the act is being done, if not personally present, be *then* doing some act in furtherance of the common design. See Branch's Ann. Tex. P. C., Sec. 700, and cases there cited.

As I understand the facts in the present case the authorities cited by them do not support my brethren in holding appellant to have been a principal, but rather illustrate the general rule stated above. In all of those cases the parties held to be principals, if not present when the crime was committed, were at that very time doing some act in furtherance of its commission.

For the purpose of this opinion it will be conceded here that appellant had conspired with his confederates to commit the crime of theft by false pretext from the Goolsbees; that everything he did was done in furtherance of that design; that his connection with and representations to the Goolsbees regarding the purposed lease of land for oil development were all a part of the scheme and devices looking to the ultimate securing of the money from Goolsbee. My brethren properly state that no offense of theft would have been consummated unless appellant's confederates had obtained the money. Then it follows that the offense of theft was committed when they received the money from Goolsbee, and not before. All the devices, schemes and false representations found in the record might have supported a prosecution for the substantive crime of conspiracy to steal, even though no money had been obtained, but no crime of theft occurred until appellant's confederates received the money from Goolsbee. Where was appellant when the money was released by Goolsbee? This record does not answer the question. Mr. Goolsbee testified that appellant came to the car and said Blackwell would take the lease, and further said:

"* * * I don't know which way Holt went from the car. No I don't know whether he went East, West or North. I did not see Holt that day any more. I didn't see Holt any more after that until I saw him in jail."

Upon being recalled for further examination Mr. Goolsbee testified that after appellant made the above statement at the car "Then he walked on down the street." This was some time before Goolsbee even got the money out of the bank. Mr. Goolsbee does not pretend to know where appellant went, or where he was or what he was doing when the money was later turned over to Harris, Ramey and Thavanow. No other witness in this record pretends to place appellant present at said time, nor to intimate that he was doing anything then in furtherance of the theft. He had done his part apparently and had disappeared. Notwithstanding this, my brethren say in their opinion that:

"He (appellant) was nearby when the money was actually extracted from Goolsbee; was by his act and conduct at the very time making false representations to keep them in position so that his associates could extract the money. He was playing his part at the very time it was done as much so as if he had been sitting in the car with them."

In the absence of any witness speaking as to the foregoing recitals of what appellant was doing I must confess my bewilderment as to how my brethren discovered it.

While committing themselves to the correct proposition that all parties to a conspiracy are not necessarily principals in the commission of the contemplated crime, yet the conclusion reached by my brethren, and certain statements found in their opinion to the effect that appellant was personally present upon various occasions and did certain things, etc., rather leads one to suspect that confusion has arisen over one who may be a principal in the substantive crime of conspiracy, and yet not a principal in the crime which is the consummation of the conspiracy. This is reflected by the rather startling announcement that the "time" of the crime was from the beginning in Tyler County until the booty was divided and that the "place" of the crime was in both Tyler and Jefferson Counties.

It is only by reason of the confusion which is surely in the minds of my brethren that would permit them to hold the

court's instruction on alibi to be not reversible. The charge is as follows:

"If you have a reasonable doubt as to the presence of the defendant at the time and place of the commission of an offense, if any was committed, you will acquit him, unless you further believe and find that he acted together with others, if there were others, with common design and intent to commit the offense as alleged in the indictment."

The charge as written would indicate that if appellant was a party to a conspiracy to steal Goolsbee's money he would be guilty as a principal under any circumstances. It may be admitted that the evidence shows that appellant did act together with others with a common design and intent to ultimately get Mr. Goolsbee's money by theft by false pretext. The charge tells the jury if appellant was not present when the theft occurred to acquit him unless he acted with others in such common design. The sense of the charge is, and the jury could have understood it in no other way than if he was a party to a conspiracy to steal Goolsbee's money he should be convicted as a principal, regardless of whether he was present when it was taken, and regardless of where he was, or what he was doing, or whether he was doing anything in furtherance of the theft when it was accomplished. This never was the law, and is not the law now. The charge is so patently vicious that it condemns itself.

If appellant had been charged as an accomplice to theft by false pretext and had been convicted as such accomplice, and was before this court under the present record contending that the evidence failed to support a finding that he was an accomplice, it would be more than difficult to sustain such a contention, yet that would be the predicament of my brethren in view of their holding that appellant is a principal.

For the reasons given in the opinion prepared by Judge Davidson, and supplemented by the foregoing additional observations, I respectfully record my dissent. The judgment should be reversed.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

The motion herein presents no new matter. Each member of the court has written at length expressing his views herein,

and none see any reason for changing the same as expressed in the original opinions. It would serve no good purpose to further write herein.

The motion will therefore be overruled.

HAWKINS, Presiding Judge, (dissenting).

I dissented originally, and my views remain unchanged.